Lester J. DWORMAN, Plaintiff,

v.

The MAYOR AND BOARD OF ALDER-MEN, the GOVERNING BODY OF the TOWN OF MORRISTOWN and the Town of Morristown, in the County of Morris, a municipal corporation, Defendant, Third Party Plaintiff,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOP-MENT, Third Party Defendant.

Civ. A. No. 1133–73.

United States District Court,
D. New Jersey.

Jan. 15, 1974.

Plaintiff's complaint charges that defendants, having failed even to commence construction of an indoor parking facility in Morristown, and to connect the utilities required to operate plaintiff's now partially completed office building therein, have breached their agreement of July 8, 1970 (Agreement). The complaint seeks a declaratory judgment that the Agreement has been breached by defendants, that plaintiff has no duty to perform further thereunder, and damages. By way of alternative relief, plaintiff would have this court enter a decree of specific performance against the defendants, directing them to carry out the terms of the Agreement by constructing the garage and installing the utilities, or to permit plaintiff to perform these tasks for them.

By this motion, plaintiff now seeks the aforesaid relief, except for a determination of damages.

Clapp & Eisenberg by Jerome C. Eisenberg, Newark, N. J., for plaintiff.

Hoyt, Jeffers & Weiland by Henry M. Hoyt, Morristown, N. J., for defendant Town of Morristown.

Villoresi & Flanagan by Alfred J. Villoresi, Boonton, N. J., for defendant Mayor & Board of Aldermen of Morristown.

Jonathan L. Goldstein, U. S. Atty. by Amos Gern, Asst. U. S. Atty., Newark, N. J., for third-party defendant HUD.

LACEY, District Judge:

This matter is before this court on plaintiff's motion for summary judgment. Fed.R.Civ.P. 56. Plaintiff, Lester Dworman, is sole owner of the Dworman Company and a citizen of the State of New York. Defendants are the Town of Morristown (the Town), a municipal corporation of the State of New Jersey, and its Mayor and Board of Aldermen. This court's jurisdiction is founded upon diversity of citizenship. 28 U.S.C. § 1332.

## FACTUAL BACKGROUND

In February 1965 the Town embarked upon a federally aided urban renewal project, the Hollow Redevelopment Project; and in March 1966 initiated a similar project, which was thereafter merged with a portion of the first project to create the Speedwell Avenue Urban Renewal Project. The latter, the subject of the dispute herein, was to receive funds promised by the United States Department of Housing and Urban Development (hereinafter HUD). Disputes as to the sufficiency of HUD's financial assistance are the subject of defendants' third-party complaint against it.

Plaintiff, through a corporation controlled by him, had submitted a proposal to become the redeveloper for the Speedwell Avenue Project. By July 1967 his application had been approved by HUD and the Town, by resolution of its governing body, had designated plaintiff as redeveloper. Plaintiff, the Mayor and Aldermen, acting as the "Local Public Agency,"[1] (hereinafter Agency), and

1. N.J.S.A. 40:55C-6, (Redevelopment Agencies Act), provides that "[a]ny governing body may by ordinance create a body corporate and politic to be known as the

the Town itself, entered into a preliminary Sponsorship Agreement outlining the general concept of the Speedwell Avenue Project. A parking garage of not more than 3,000 car spaces was to be built and owned by the Town. Atop the garage a concrete slab was to be constructed, upon which plaintiff would in turn construct a retail shopping mall. The Town, with plaintiff's approval, was to select an architect to plan the garage.

Between 1967 and July 1970 the Town and the Agency apparently fulfilled their obligation to acquire the property, clear the renewal site, and relocate the displaced residents. Plaintiff during this period agreed to construct an additional structure, a ten-story office building, on the project site.

On July 8, 1970, the Town, the Agency, and the plaintiff entered into the Agreement allegedly breached. Generally, the Agreement provided for the construction of the garage, the retail shops, and the ten-story office building in seven interlocking construction phases. The Agreement consisted of two parts: Part I, setting forth the terms and conditions negotiated by the three parties; and Part II, basically provided by HUD, but amended by the parties, a "Standard Form of Lease of Land for Private Redevelopment." The amendments are reflected in section 14 of the Agreement, entitled "Modifications of Part II."

Under the Agreement, the Agency was to convey land to the Town for the construction of the garage and lease sufficient surface and air rights to plaintiff to erect the office building and shopping mall. Following the required submission by plaintiff's architects of preliminary and then final plans, and approval thereof by the Agency, the phased construction was to begin.

Phase I of the plan required plaintiff to commence construction of the office building within five months of the approval of final construction plans and to complete it within 14 months of its commencement. [Section 5(a)(i)]. After plaintiff's completion of 30 percent of the office building, the Town was to commence construction of the parking garage (Phase A), and was to have the Phase A section of the Garage completed within six months of the completion of Phase I. [Section 13(f)]

The lease term, during which plaintiff was to be in possession of the aforementioned air and subsurface rights, was not to commence until the following three events occurred: 1) The Agency approved "Final Construction Plans"; 2) The Agency or the Town provided plaintiff with 300 temporary, but easily accessible parking spaces; and 3) "[T]he Town had been duly authorized to sell parking facility bonds or other bonds necessary to finance construction of Phase A of the Parking Garage." (Section 3). Moreover, Section 3 of the lease also required both a written notice to plaintiff of the above occurrences and the execution of a supplemental agreement, before the 52-year lease term was to begin. There is no evidence before me to indicate occurrence of the conditions to commencement.

After Phase I was to be completed and Phase A begun, the plaintiff and the Town were to construct under Phases II and III, and Phases B and C respectively. These later phases, however,

---

'. . . Redevelopment Agency' inserting the name of the municipality creating such agency." By a resolution dated January 11, 1965, the local governing body of Morristown appointed itself as the Redevelopment Agency, pursuant to N.J.S.A. 40:55C-37. See Ott v. Town of West New York, 92 N.J.Super. 184, 222 A.2d 541 (L. Div.1966). By virtue of N.J.S.A. 52:27D-47(f), the Redevelopment Agency is called the "local public agency."

Under federal law "local public agency" is defined as "any State, county, municipality or other governmental entity or public body, . . . authorized to undertake the project for which [urban renewal] assistance is sought." 42 U.S.C. § 1460(h). Moreover, 42 U.S.C. § 1451 urges that the Secretary of Housing and Urban Development encourage the operation of local public agencies toward the solution of community development problems on a "unified metropolitan basis."

are not material to the breaches of the Agreement alleged herein.

Between July 8, 1970 and the commencement of construction by plaintiff in November 1972, several events have, or are alleged to have, occurred. Bernard Shaw, the architect hired by the Town to draw the garage plans, failed to finish the needed plans before he was replaced in that position by Porter and Ripa, Associates, the present architects. Both the Town's architect and officials of the Town itself state that as early as late 1970 the parties expressly agreed that the phasing concept in the written agreement was to be abandoned in favor of a single phase construction approach and that all building plans now in existence have been drafted on that basis. The Town, in fact, passed a resolution in May 1973 requesting its attorneys to negotiate an amendment to the Agreement providing for the elimination of the phasing concept. Defendants claim that the plaintiff's attorneys represented that no amendment was necessary while plaintiff asserts that he merely refused to accept the Town's proposed changes.

The defendants, in their supporting affidavits, also claim that the plans submitted by plaintiff's architect for the above-garage mall imposed a significantly greater amount of weight upon the parking garage pillars than the 100 pounds per square foot "live weight" contemplated in Paragraph 1.a. of Schedule G of the Agreement.[2] More specifically, the affidavits submitted by defendants state that plaintiff's proposed construction plans would require as much as 1,900 pounds per square foot of weight carrying capacity on some portions of the slab. These changes, they assert, would increase the cost of the garage construction by hundreds of thousands of dollars. Moreover, they

claim, by way of Alderman Goodman's affidavit, that notice of the changes was not given to defendants until shortly after submission of preliminary plans to the New Jersey Division of Labor and Safety in July of 1972.

Plaintiff, however, denies the existence of any weight overload and claims that any changes in the plans were so minor that they would create little if any additional expense. The affidavit of plaintiff's construction manager states that the additional weight requirements are only necessary in isolated areas for support of decorations such as fountains; that the required changes should only cost $10,000 (out of $20,000,000 for the project); and that such spot changes are a common occurrence in the industry.

There is little doubt, however, that the real obstacle to the timely construction of the Speedwell Project is the Town's failure to obtain adequate financing for the construction of the parking garage. During 1971 and 1972, defendants claim, numerous conferences were held for the purpose of devising a satisfactory financing arrangement. Moreover, a so-called "Blue Ribbon Panel," appointed by the then Mayor Cattano, studied the project and recommended alternate means of financing, in particular, the issuance of general obligation bonds by the Town, the issuance of bonds by the Morristown Parking Authority, and a lease-back arrangement whereby plaintiff himself would construct the garage for the Town. None of these plans was adopted.

According to defendants, the issuance of general obligation bonds was rejected early in the course of discussions. By virtue of N.J.S.A. 40A:2-6 (1973), Morristown, like other municipalities, was and continues to be limited in the

2. See, However, p. 1067 infra, dealing with the Town's amendment to its answer and subsequent affidavits submitted by it alleging that data received from plaintiff's architects regarding the necessary weight capacity for the garage columns was inaccurate, not because the loads to be carried were greater than agreed, but rather because they were to be less than contemplated. This allegedly drastic change in weight requirements, the Town asserts, resulted from an agreement to abandon any future plans for the construction of apartments on top of the garage roof.

amount of indebtedness it may incur without State authorization. Affidavits of Town officials state that at all relevant times this limit had already been reached, and, in fact, greatly exceeded by Morristown. Plaintiff, however, denies that the amounts needed to build Phase A of the garage will cause the Town to exceed this debt limit.

The second financing alternative, bonds issued by the Parking Authority, apparently appeared equally impracticable to all concerned. Although the Authority was not included in the statutory debt limit provisions, its officers refused to accept the arrangements desired or proposed by the Town. Despite negotiations extending into early 1973, no agreement could be reached.

Some time before November 1972 the Town and plaintiff also discussed the third alternative arrangement whereby the Town would permit the plaintiff to construct the garage and thereafter lease it back to the Town. Plaintiff asserts that the Town had in fact assured him in the fall of 1972 that the Town would adopt such an arrangement, but that, after the November election, town officials refused to keep their promise. Defendants, however, state that negotiations on such a plan did not culminate in anything firm until December 1972 when plaintiff submitted a proposed lease whereby he would build the garage and re-lease it to the Town for a term of 30 years at an annual rental of $750,000. Town officials apparently supported this arrangement and the Board of Aldermen, in March 1973, passed a resolution authorizing the Town Attorney to aid them in the negotiation of the final arrangements toward that end.

Before the lease was reduced to writing, however, the Town Attorney advised the Board that a recent New Jersey Superior Court decision, Bulman v. McCrane, 123 N.J.Super. 213, 302 A.2d 163 (Ch.Div.1973), had voided a similar arrangement and, in light of that deci-

sion, it was concluded that the Town was vulnerable to a taxpayer's suit if the new lease were signed.[3] On May 14, 1973 the Board embodied the Attorney's suggestion in a resolution abandoning the lease back plan.

After rejection of the lease back plan, it was resolved that the Town would accept public bids for construction of the garage pursuant to New Jersey's Local Public Contracts Law, N.J.S.A. 40A:11-1 et seq. (Supp.1973), and obtain financing therefor by issuing general obligation bonds under a statutory exception approved by the State. Toward this end, the Town, by an ordinance introduced in March, and passed in May of 1973, created a "Parking Utility" pursuant to N.J.S.A. 40:60-25.1. The Town asserts that it next began preparation of a formal request to the New Jersey Division of Local Finance for an exception to the debt limit requirement. See N.J.S.A. 40A:2-7. In furtherance of the proposed application, a new feasibility study of the project was prepared and submitted to Town officials on September 10, 1973. It is conceded by Town officials, however, that the method of financing now being pursued by the Town will lead to commencement of construction no sooner than February of 1974.

The proposed and anticipated federal assistance has also complicated the picture. On February 16, 1973 the Town filed with HUD its "Fourth Amendatory Project NJR-159 Loan and Grant Application" for urban renewal funds. The Town requested over $11 million, a $5.1 million increase over their previous requests, an increase the Town claims is essential to the preparation of the renewal site for construction of the garage.

Defendants, in their third-party complaint against HUD, contend that their application has not been acted upon since its filing. For its part, HUD responds that most of the money the Town

---

3. This decision was recently reversed. Bulman v. McCrane, 64 N.J. 105, 312 A.2d 857 (N.J. Supreme Court 1973).

requests would come from an appropriations bill not yet signed by the President and that it has no obligation to increase its allotment to the Speedwell Project. HUD also refuses to increase blindly its funding of the project without assurance that the Town can finance and construct the garage as promised.[4]

While defendants have failed to fulfill their obligation to commence construction, plaintiff has performed his. In November 1972, purportedly relying upon the Town's acceptance of the lease-back arrangement for the garage, plaintiff commenced construction of Phase I, the ten-story office building.

Moreover, both plaintiff and defendants agree that 30 percent of Phase I has been completed by plaintiff and that notice sufficient to require commencement of construction by the Town was given in March of 1973. Since that date plaintiff, in fact, has completed 85 percent of Phase I, before halting construction.

On August 6, 1973, plaintiff filed this suit and on September 19, 1973, moved for summary judgment. Defendants answered on September 21, 1973, and, at the same time, counterclaimed for a declaratory judgment as to their rights and obligations under the contract.

In addition to his claim of breach regarding the failure to construct the parking garage, plaintiff asserts that defendants have further violated the lease agreement by failing to install utility connections accessible to his nearly completed office building. The Town, however, asserts by way of affidavit that temporary sanitary sewers have already been installed and that contracts for the installation of water lines have been signed. Counsel for plaintiff, during oral argument, appeared to be satisfied with the steps taken by the Town and I shall consider that issue resolved.

I

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the prerequisites to granting of a motion for summary judgment. It provides:

> The judgment . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is *no genuine issue as to any material fact* and that the moving party is entitled to judgment as a matter of law. [emphasis added]

Thus, the burden upon the movant is not an easy one and the court will not lightly deprive a party of its right to a trial on disputed material factual issues. As the Third Circuit Court of Appeals has noted:

> . . . On a motion for summary judgment the Court must take the view of the evidence most favorable to the party against whom the motion is directed, giving to that party the benefit of all favorable inferences that might reasonably be drawn from the evidence, thereby placing the burden of proving the absence of any factual issue on the movant.

Janek v. Celebrezze, 336 F.2d 828, 834 (3d Cir. 1964). *See also* Adickes v. Kress & Co., 398 U.S. 144, 147, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); Friedman v. Meyers, 482 F.2d 435 (2d Cir. 1973); Benton-Volvo-Metairie, Inc. v. Volvo Southwest, Inc., 479 F.2d 135 (5th Cir. 1973); Olympic Junior, Inc. v. David Crystal, Inc., 463 F.2d 1141 (3d Cir. 1972); Shaughnessey v. Penn Central Trans. Co., 454 F.2d 1223 (3d Cir. 1972); Kress, Dunlap & Lane, Ltd. v. Downing, 286 F.2d 212 (3d Cir. 1960).

While this court does not underestimate the burden imposed upon movant herein, neither will it ignore the propriety of a summary judgment on an appropriate set of facts. Particularly since the 1963 amendment to Rule 56, the courts in this Circuit have consistently granted summary judgment on a clear showing, by appropriate documents, that no genuine issue of facts exists and the movant is entitled to prevail

---

4. At least $1.2 million of the needed moneys, transferred from another Morristown proj-ect, has just been allocated to the Speedwell Project.

as a matter of law. Season-All Industries, Inc. v. Turkiye Sise Ve Cam Fabrikalari, A. S., 425 F.2d 34, 38 (3d Cir. 1970); Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d Cir.), cert. denied, 396 U.S. 941, 90 S.Ct. 378, 24 L.Ed.2d 244 (1969); Robin Construction Co. v. United States, 345 F.2d 610, 614 (3d Cir. 1965). We must therefore agree with the court in Mintz v. Mathers Fund, Inc., 463 F.2d 495, 498 (7th Cir. 1972) when it found:

> The primary purpose of a motion for summary judgment is to avoid a useless trial . . . [which] results in delay and expense. . . .

> [C]ourts should not look the other way to ignore the existence of the genuine issues of material facts, but neither should they strain to find the existence of such genuine issues where none exist. [citations omitted]

With these principles in mind I shall first consider the factual issues raised by defendants and thereafter deal with the purely legal defenses they assert. At the outset I find several extremely significant facts are undisputed. Plaintiff, pursuant to section 5 of the Agreement, commenced construction of Phase I in November of 1972. In early March 1973, pursuant to section 13(f) of said Agreement, he notified the Town that he had completed 30 percent of the Phase I construction, thus obliging the Town to commence construction of the garage. As of now, almost a year later, it has not done so and, further, does not expect to do so before another month, at least. In short, defendants, in effect, admit their failure to perform their promise. Nonetheless they have resourcefully endeavored to present genuine and material factual disputes.

■ They first claim that the creation of the Parking Utility by the Town in May 1973 constituted commencement of the garage project under section 13(f) of the Agreement. But the clear language of the Agreement defeats any such claim. Section 13(f)(i)(a) specifically requires "construction to com-

mence," a phrase whose fair import this court cannot reasonably equate with the mere passage of an ordinance. In fact, it appears that the Town cannot either; in paragraph 14 of its answer the Town admits its failure to commence construction.

The second factual issue raised by defendants also fails to survive analysis. They point to section 3 of the Agreement, discussed *supra*, providing that the "Lease term" shall not begin until, *inter alia*, 300 car parking spaces have been provided by the Town and the Town has obtained authorization to issue bonds to finance the garage. Although defendants never directly asserted it in their moving papers, they orally argued that these two conditions somehow postpone their obligation to commence construction. They further contend that an issue of fact exists as to whether those conditions were satisfied and whether the Town was required to construct at all before such satisfaction. Any such conclusion, however, must, as a matter of law, be rejected.

■ Disputes involving the interpretation of unambiguous contracts are resolvable as a matter of law and are, therefore, appropriate subjects for summary judgment. Parish v. Howard, 459 F.2d 616, 618 (8th Cir. 1972); New Wrinkle, Inc. v. John L. Armitage & Co., 238 F.2d 753, 757 (3d Cir. 1956); R. C. Craig, Ltd. v. Ships of Sea, Inc., 345 F. Supp. 1066, 1069 (S.D.Ga.1972); United States v. Manufacturers Casualty Ins. Co., 158 F.Supp. 319, 320 (S.D.N.Y. 1957). I find the meaning of "Lease term" in this Agreement not the least bit ambiguous. Article XVII of the Agreement ascribes to the phrase "Lease term," the meaning assigned to it in section 102 of that same document. Section 102, in turn, states:

> *Lease of Property.* Subject to all the terms, covenants and conditions of the Agreement, the Agency does hereby demise and lease the Property to the Redeveloper, and the Redeveloper does hereby take and hire the Property from the Agency for the lease term

specified in Section 3 of Part I hereof (hereafter called "Lease Term") unless the Lease Term is sooner terminated as herein provided.

Thus, "Lease Term" specifically refers to the transfer of possession of the "property" and not to any construction obligation. The lease of the property is *subject* to the other terms of the Agreement, not a condition precedent to them. If there be any reasonable condition precedent to obligations under section 3, it would be the construction by defendants of the above-garage platform slab which plaintiff agreed to lease.

The independence of section 3 and its conditions from the construction obligations set forth in sections 5 and 13(f) becomes even more apparent upon closer examination of the Agreement. In section 5, entitled "Time for Commencement and Completion of Improvements," no mention whatsoever is made of the "Lease Term," nor is there any cross-reference to any provision of section 3. Moreover, section 5 of the Agreement demands that plaintiff begin construction of Phase I within five months of the approval of final construction plans. If this court is to construe commencement of the lease term as a condition precedent to the construction obligation set forth in section 5, the provision for the approval of plans therein would be totally unnecessary because submission of those plans is already required as a condition precedent to commencement of the lease term by section 3.

The separability of the two obligations is further supported by a reading of section 5(b)(1). This provision grants plaintiff an extension of time to complete Phase I if the 300 temporary parking spaces are not provided by defendants *within 30 days of the expected completion of Phase I.* These 300 spaces, as noted above, are also deemed a condition precedent to the commencement of the lease term. Certainly an event that need not take place until 30 days before Phase I is completed cannot be held a condition precedent to construction of a garage required to be started when only 30 percent of Phase I was built. [Section 13(f)]. If these conditions controlled the commencement of construction, the extension provision of section 5 would be rendered meaningless.

Finally, section 13(f) sets out a detailed schedule for commencement and completion of the garage by the Town. Nowhere is the commencement of the lease term, or any of the conditions to it, alluded to or mentioned. Therefore, I find, as the Second Circuit recently found in reversing the denial of summary judgment in a contract action, "in light of the unambiguous language used, [I] see no basis for substituting an unfounded meaning for that plainly evidenced by the writing of the parties." Security Options Corp. v. Devilliers Nuclear Corp., 472 F.2d 844, 846 (2d Cir. 1972).

Since I have determined that the commencement of the lease term is not a contractual prerequisite to the Town's obligation to construct the garage, several other purportedly material factual disputes lose their significance. Defendants apparently dispute the date upon which the lease term was or is to commence; whether the 300 car parking spaces have, in fact, been provided; what the lease will cover if financing is not found and the extent, if any, of an obligation to pay for the land and air rights which plaintiff now possesses. Some of these issues are, of course, relevant to the requests for declaratory judgment contained in the counterclaim filed by both defendants. However, those claims are not before us on the instant motion for summary judgment and to that extent are not considered here. They do not raise genuine issues as to defendants' alleged breach of their obligation in light of my construction of the Agreement.

The remainder of the alleged factual disputes focus upon several other occurrences defendants claim excuse their defaults under the Agreement. In dealing with these claims it must be kept in mind that "[t]he showing of a

genuine issue for trial is predicated upon the existence of a legal theory which remains viable under the asserted version of the facts, and which would entitle the party opposing the motion . . . to a judgment as a matter of law." Bushie v. Stenocord Corp., 460 F.2d 116, 119 (9th Cir. 1972); McGuire v. Columbia Broadcasting System, Inc., 399 F.2d 902, 905 (9th Cir. 1968).

As one of their affirmative defenses both defendants allege "[a]ccord resulting from negotiations between parties modifying this defendant's contractual duties, and conditions precedent thereto." Defendants apparently raise this defense and that of estoppel in the following factual context. As hereinabove discussed, defendants state that the concept of phasing was abandoned by oral agreement of the parties, long before the time for commencement of construction. Plaintiff denies that even an oral agreement to this effect was consummated. Defendants admit no written amendment to the Agreement was signed.

■■ Despite the dispute as to the existence of this oral "accord," it is of no legal significance, even if its existence is assumed. The Agreement clearly falls within the Statute of Frauds, both as a lease running for more than three years, pursuant to N.J.S.A. 25:1–1, and as an "agreement that is not to be performed within one year from the making thereof," pursuant to N.J.S.A. 25:1–5, subd. e. Although the original Agreement clearly satisfies the statute, the abandonment of phasing, as described by defendants, is at best an oral modification of it. Such amendments clearly do not satisfy the statute's requirements. It is beyond dispute that, under applicable New Jersey law, Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188 (1938), "a contract which the statute of frauds requires to be in writing may not be modified by a subsequent oral agreement." Willow Brook Recreation Center, Inc. v. Selle, 96 N.J.Super. 358, 364, 233 A.2d 77, 80 (App.Div.1967), cert. denied, 51 N.J. 187, 238 A.2d 473 (1968). *Accord,*

Melcer v. Zuck, 101 N.J.Super. 577, 580, 245 A.2d 61 (App.Div.1968); Halpern v. Shurkin, 98 N.J.Eq. 28, 129 A. 487 (Ch. 1929); Kerzner v. Chanin, 98 N.J.L. 38, 118 A. 693 (Sup.Ct.1922); 2 A. Corbin, Contracts § 309 at 108 (1950).

Thus, absent an estoppel or a valid waiver, the alleged modification is of no consequence on this motion. Moreover, even if the Agreement was effectively modified as claimed, defendants make no factual showing of any relationship between elimination of the concept and the delay. As plaintiff rightly asserts, phasing or lack of it is not particularly relevant where the Town has not even started construction at all.

But even if this court was to assume the phasing dispute had some relevance in this situation, a provision of the Agreement controls the result. Section 1503 states:

> This Agreement may be amended by written document duly executed by the parties hereto, evidencing the mutual agreement of the parties hereto to such amendment.

Defendants have produced no such writing.

■ Defendants' claim of an estoppel as the result of negotiations is also unfounded. Although an estoppel could render the Statute of Frauds inapplicable herein, and offer defendants a defense to this action, there are certain preconditions to its application. As 3 Pomeroy's Equity Jurisprudence (5th ed. 1941) at 189 points out, equitable estoppel must arise from:

> . . . [T]he effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy.

*Accord,* Highway Trailer Co. v. Donna Motor Lines, Inc., 46 N.J. 442, 449, 217 A.2d 617, 621 (1966); cert. denied sub nom. Mount Vernon Fire Insurance Co. v. Highway Trailer Co., 385 U.S. 834, 87 S.Ct. 77, 17 L.Ed.2d 68 (1966). *See also* West Jersey Title & Guaranty Co. v. Industrial Trust Co., 27 N.J. 144, 153, 141 A.2d 782, 787 (1958).

For purposes of summary judgment this court must accept as true defendants' claim that plaintiff orally agreed with defendants to modify the contract as to phasing and, in fact, as stated in the Goodman affidavit, that defendants relied upon plaintiff's representation that no written agreement was necessary to effect the agreed change. But even assuming the disputed to be true, how had defendants changed their position to their detriment in reliance upon this representation? Nowhere do defendants' affidavits or documentary evidence lend any support to the proposition that defendants' failure to perform was in any way related to the abandonment of phasing. As was noted above, an allegation of detrimental reliance and action thereon is difficult to accept in light of the undisputed fact that defendants have neither commenced construction, nor connected their failure to do so to modification of the construction schedule. Thus, "[t]he [defendants] failing to show they acted to their detriment in reasonable reliance on manifestations of [plaintiff] . . . no question of estoppel is presented." Ins. Co. of North America v. McCleave, 462 F.2d 587, 588 (3d Cir. 1972); Bailis v. Reconstruction Finance Corp., 128 F.2d 857, 859 (3d Cir. 1942); *see* 2 A. Corbin, Contracts § 311 at 121 (1950).

Defendants apparently also claim that an estoppel arises from plaintiff's alleged modifications of the weight requirements of their mall and the consequent increase in costs caused thereby. Plaintiff and defendants, by their several exchanges in their affidavits on this issue, have uncovered a genuine dispute over how greatly plaintiff's plans exceed the contractual specifications and how much any overage will cost. While recognizing the dispute I remind defendants that "[i]t is not enough for the party opposing the motion for summary judgment merely to point to disputes of fact." Bushie v. Stenocord Corp., 460 F.2d 116, 119 (9th Cir. 1972). Even if the facts in defendants' affidavits are all deemed to be true, they do not amount to the elements requisite to a showing of estoppel.

According to the affidavit of Alderman Goodman, plaintiff's architect submitted preliminary plans of its improvements for State review shortly after July 1972. Thereafter the Town, through Mr. Di Chiara, informed plaintiff that his plans put a greater weight burden on the garage than originally contemplated and consequently, the Town would have to redraw its garage plans accordingly. It appears from Mr. Sousa's affidavit, however, that the garage plans have already been amended to provide for that extra capacity. But defendants once again make no showing whatsoever of any detrimental action or forbearance in reliance upon plaintiff's submission of his modified plans. Defendants, of course, amended their plans to conform with plaintiff's but such action does not even raise the inference that they were thereby precluded from performing that which plaintiff alleges they should have performed under the Agreement. Without any facts showing that plaintiff's conduct delayed or precluded the timely building of the garage, defendants' claim must fail.

The Town, since argument of the motion, has amended its answer to allege an estoppel by reason of plaintiff's failure to supply corrected column loading data when it was requested. The substance of this additional allegation apparently arises from the elimination of plans for apartment buildings supposedly due to be placed atop the parking garage. As a result of this change the Town would have this court infer the load on the garage columns would be substantially lightened. Although it must be assumed, for the purpose of this

motion, that Dworman has not supplied the information at issue, his supposed failure to do so will not excuse the Town's breach, at least on the record as it is presently before us.

The only injury said to be caused by the plaintiff's failure is the claim by Mr. Di Chiara, in his affidavit of December 19, 1973, that the preparation of specifications for public bidding or negotiation will be delayed if the information supposedly requested is not forthcoming. Unfortunately for the Town, however, the affidavit also noted that the authorization for such specifications was not even given to the architects until December 3, 1973, months after the initial default. Moreover, the Town does not explain the intervening delay, but rather presents documentary evidence that implies that actual discussions about the data problem took place no earlier than late November of 1973. Again defendants make no connection between their allegations and the default at issue.

There is one more infirmity in the Town's affirmative defense. Neither the affidavits nor the documents submitted by the Town lend support to the inference that a firm agreement, oral or written, was ever reached as to the building of apartments. There is no evidence contradicting plaintiff's sworn statement that the construction of apartments never went beyond the discussion stage. Moreover, although there appears to be no dispute that plans for the garage, including column loads specifications, were drawn up prior to any contemplated apartment construction, defendants do not allege that these original plans are now, for some reason, inadequate to guide construction.

■ Defendants also claim a waiver of breach by reason of the negotiations alleged to have modified their contractual obligation. As I have stated earlier, nothing submitted by defendants gives the slightest indication that there was a contractual modification of any legal effect in this case.

Despite the paucity of factual support *for it*, however, I shall deal with defendants' claim as I understand it. Initially, the language of the contract itself contradicts defendants' assertions. Section 1504 of the Agreement provides:

> *Waivers.* Any right or remedy which the Agency or the Redeveloper may have under the Agreement, or any provision of the Agreement, may be waived *in writing by the Agency or the Redeveloper* without the execution of a new or supplemental agreement. No waiver made by either party with respect to the performance, or manner or time thereof, of any obligation of the other party or any condition to its own obligation under the Agreement shall be considered a waiver of any rights of the party making the waiver with respect to the particular obligation of the other party or condition of its own obligation beyond those *expressly waived* and to the extent thereof, or a waiver in any respect in regard to any other rights of the party making the waiver of any other obligations of the other party. [emphasis supplied]

From the foregoing it is clear that any waiver, particularly of performance, must, of necessity, be in writing and express. Defendants' affidavits and documents make no such showing.

Even if one is to ignore the mandates of the Agreement, defendants' claim of waiver fares no better. The essential elements of an effective waiver are clearly set forth by the New Jersey Supreme Court in West Jersey Title Co. v. Industrial Trust Co., 27 N.J. 144, 152–153, 141 A.2d 782, 786 (1958):

> "Waiver" is the intentional relinquishment of a known right. It is a voluntary act, "and implies an election by the party to dispense with something of value, or to forego some advantage which he might at his option have demanded and insisted on" . . . It is requisite to the waiver of a legal right that there be "a clear, unequivocal, and decisive act of the party showing such a purpose or acts

amounting to an estoppel on his part" . . . "Waiver" presupposes a full knowledge of the right and an intentional surrender. . . . [citations omitted]

But this intentional relinquishment of the right to strict performance of the Agreement herein need not even be an express one. "Where a party . . . has consistently acted in such a way as to indicate to his co-contractor that he does not intend to hold the latter to a particular provision of a contract he is taken to have waived his right to enforce that provision." Neustadter v. United Exposition Service Co., 14 N.J. Super. 484, 82 A.2d 476 (Ch.Div.1951). *Accord*, Lane v. Blackwood Estate, 104 N.J.L. 152, 138 A. 871, 873 (E & A 1927); Schlegel v. Bott, 93 N.J.Eq. 607, 117 A. 605 (E & A 1922).

Defendants do not in their pleadings or affidavits raise even the inference that plaintiff did not intend to hold defendants to a particular provision of the Agreement. We repeat that the affidavits of Alderman Goodman and Mr. Sousa raise a factual issue as to whether the concept of "phasing" in the Agreement was waived by plaintiff. Yet how can this waiver be extended further when defendants' affidavits make no mention whatsoever of any discussion of a contemplated delay in initiation of construction? Even if the manner of construction was to vary, where is the assertion that time of commencement of construction is to vary as well?

As the "phasing" argument falls before scrutiny, so falls the assertion that plaintiff's changes in the weight the garage must bear acted as a waiver of the previously agreed time of performance. While defendants' affiants unanimously claim that plaintiff's purported plan modification would increase expenses, none of them claim defendants' performance was delayed thereby; that plaintiff understood this change or any other modification to countenance any delay; or that plaintiff has ever acted as if such an understanding existed. In fact,

as noted above, Mr. Sousa, the architect, has admitted that the plans have already been amended to accommodate the alleged changes. I fail to find the slightest indication that plaintiff has surrendered anything by any modification and accordingly hold, as a matter of law, that no legally effective waiver took place. *Cf.* Stewart v. Meyers, 353 F.2d 691 (7th Cir. 1965).

Defendants, however, submit one more excuse for their failure to perform. Paragraph 1(a) of their separate defenses states that they are excused by

(a) Temporary and/or permanent impossibility of performance resulting from (i) Unavoidable delay in receipt by Town of State approval of financing of construction of parking garage; (ii) Impairment of this defendant's ability to obtain such approval by reason of plaintiff's institution of this action; and (iii) withholding from Agency by Federal government of funds needed for project costs.

This court disagrees and thus holds as a matter of law that this defense is totally lacking in merit.

Any discussion of defendants' impossibility defense must begin with an analysis of section 1304 of Part II of the Agreement. The provision reads as follows:

*Non-Performance Due to Causes Beyond Control of Parties.* In the event performance of any of their respective covenants, agreements or obligations under the Agreement by the Agency or the Redeveloper is prevented, interrupted or delayed by causes beyond its control, including but not restricted to strike, riot, storm, flood, acts of God, or of the public enemy, acts of the Government, acts of the other party, fires, epidemics, quarantine restrictions, freight embargoes and unusually severe weather, or delays of subcontractors due to such causes, and not caused by any act or failure to act by the party thereby delayed in such performance, the date or time or times for the performance of such covenant,

agreement or obligation by the Agency or the Redeveloper shall be extended for a period of time equal to the number of days the performance of such covenant, agreement or obligation by the Agency or the Redeveloper is so prevented, interrupted or delayed and, in such case, neither the Agency nor the Redeveloper shall be liable for any costs, losses, damages, injuries or liabilities caused to or suffered or incurred by the Agency or the Redeveloper in connection with, or, as the result of, any such delay in, or non-performance of, such covenant, agreement or obligation. In the event that the Agency or the Redeveloper intends to avail itself of the provisions of this Section, the Agency or the Redeveloper shall give written notice of such intent to the other; such notice to be given in not to exceed fifteen days from the date performance of such covenant, agreement or obligation was so prevented, interrupted, or delayed.

Moreover, this provision of the contract was certainly well within the cognizance and understanding of the parties to this action since the original 15-day notice requirement herein was amended to give the parties 30-days to avail themselves of the no-damage provisions. Neither defendant, however, makes a showing that the requisite notice was given.

Although this section does not expressly prevent defendants from asserting a common law defense of impossibility, the implication is unavoidable. The parties could not have intended that the responsibility imposed by such a notice requirement could be ignored by the defaulting party while the benefits of the provision, release from liability, could be attained by resort to the common law. Such an interpretation would render the provision virtually meaningless. Furthermore the provision is particularly applicable here where the circumstances relied upon by defendants, "acts of the Government," are specifically covered by section 1304.

Even if there was a question as to whether this provision applied to the Town as well as the Agency, the impossibility defense would still fail, though all the facts presented by the Town are taken as true. It is well settled that "[i]mpossibility of performing a promise that is not due to the nature of the performance but wholly to the inability of the individual promisor, neither prevents the formation of a contract nor discharges a duty created by a contract." Restatement, Contracts § 455 (1932). Ocean Air Tradeways, Inc. v. Arkay Realty Corp., 480 F.2d 1112, 1117 (9th Cir. 1973); *Accord,* 6 A. Corbin, Contracts, § 1332 at 361 (1950). *See also* Duff v. Trenton Beverage Co., 4 N.J. 595, 606, 73 A.2d 578 (1950). Both the failure of the Town to obtain bond financing and the shortage of funds forthcoming from HUD affect only the Town's own inability to perform; by no means do they deprive other persons of the ability to construct a parking garage on that site. The willingness of plaintiff to construct the garage pursuant to a lease-back arrangement exemplifies this.

The law is equally clear as to the more specific inference urged here, that third parties, HUD, the various officials from the Morristown Parking Authority, and the State Division of Local Finance, excusably delayed defendants' performance. Professor Corbin states the rule concerning performance of third parties:

One who contracts to render a performance or to produce a result for which it is necessary to obtain the co-operation of third persons is not excused by the fact that they will not cooperate . . . . .

\* \* \* \* \* \*

If the promised performance can not be rendered without performance by the third party the promisor must take sufficient pains to induce such performance. The risk is his; the case is merely one of unexpected difficulty or expense.

6 A. Corbin, Contracts § 1340, at 405, 407 (1950). *See also* Annot. 84 A.L.R. 2d 12, 31 (1962); 6 Williston, Contracts § 1932 (Rev'd ed.). Recalcitrance on the part of local, state, and federal authorities to advance funds or assume debts cannot be held a legally effective excuse for the Town's default. This is not a case where a supervening rule or regulation of the government objectively renders performance impossible and thus releases the Town from liability. *See generally* Annot. 84 A.L.R.2d 12 (1962).

██ Defendants' impossibility argument becomes yet more untenable because the events upon which they rely to bolster their cause, namely, the failure to secure approval of their bond issue and a federal grant, were both reasonably foreseeable and in the reasonable contemplation of the parties at the time of contracting. Although the former highest court of this state has said, "[g]enerally, impossibility of performance offers no relief from the performance of contractual obligations, whether the impossibility could or could not have been foreseen at the time of making of the contract", Schaefer v. Brunswick Laundry, Inc., 116 N.J.L. 268, 271, 183 A. 175, 177 (E & A 1936), it appears that the more modern view in this state holds that only those events that should have been in the contemplation of the contracting parties and thus were reasonably foreseeable as possible contingencies, will not excuse performance. Schiff v. Schiff, 116 N.J.Super. 546, 561, 283 A.2d 131 (App.Div.1971); Edwards v. Leopoldi, 20 N.J.Super. 43, 53, 89 A.2d 264 (App.Div.1952); Newark v. North Jersey Water Supply Comm'n., 106 N.J.Super. 88, 254 A.2d 313 (Ch. Div.1968), aff'd., 54 N.J. 258, 255 A.2d 193 (1969); Lincoln Bus Co. v. Jersey Mutual Cas. Ins. Co., 112 N.J.Eq. 527, 164 A. 867 (Ch.1933); 6 A. Corbin, Contracts, § 133 at 365–66. But even if this court applies this more liberal standard, defendants' proofs, even when assumed to be true, are insufficient to win their argument.

The words of the Agreement itself cast doubt upon unforeseeability of the occurrences upon which defendants rely. Section 3 of the Agreement makes authorization of the construction bonds and notice of their issuance to plaintiff a condition precedent to the commencement of the lease term and thus to plaintiff's obligation to pay rent. Surely this express recognition of the financing steps required by the Town refutes any claim that bonding, or the failure to bond, was not reasonably in the minds of the parties at the signing in July of 1970. Moreover, nothing in the affidavits submitted by defendants or in the Agreement itself expressly or impliedly indicates that the risk of financing the garage was to fall upon the plaintiff. The burden in this situation was clearly intended to fall upon the Town, where it rightly belongs. Plaintiff has financed his construction; defendants can be accorded no more favorable treatment. In this regard the words of Judge Mintz in Newark v. North Jersey Dist. Water Supply Comm'n., 106 N.J.Super. 88, 103, 254 A.2d 313 (Ch.Div.1968), aff'd., 54 N.J. 258, 255 A.2d 193 (1969), are peculiarly appropriate:

> This court cannot relieve municipalities from hard bargains simply because alleged as such. Municipal contracts stand on the same footing as contracts between natural persons and courts will not inquire into the reasonableness of the terms of such contracts in the absence of bad faith, fraud or capricious action.

Defendants are in no better position as to the failure to obtain funding from HUD. As earlier noted, failure of a third party to render his performance is not an excuse for a party's nonperformance, under the instant circumstances. Moreover the affidavit of the Town's Urban Renewal Chief, Raymond Di Chiara, states that HUD's refusal to act on the Town's funding application "has deprived the Project of the necessary guarantee of funds for the preparation of the site for the construction of the

garage and the furnishing of utilities to the Project." More specifically, these funds, he claims, are needed to pay for construction of retaining walls, culverts and internal roads. Certainly the absolute need for such funding should have been contemplated by the Town at the time of the signing of the Agreement. Yet the failure to obtain these funds is nowhere proved or even asserted to have been unforeseeable. There is no evidence of a binding obligation upon HUD to supply these funds; there is only an affidavit stating that the Town's *application* for funds has neither been granted nor denied. If there was reason to believe a rejection by HUD of its mere request was not at least reasonably foreseeable at the time of the Agreement, the affidavits and pleadings fail to show it.

Further, if there is any part of this needed funding attributable to increased costs, there is no evidence that such a rise in costs was not foreseeable as well. Without such a showing defendants' claims amount to little more than "mere unanticipated difficulty, inconvenience, [and] unexpected expense" which will not excuse a failure to perform. Consolidated Laboratories, Inc. v. Shandon Scientific Co., 413 F.2d 208, 212 (7th Cir. 1969).

■ The Town also belatedly amended its answer to claim that its performance of the Agreement was rendered impossible by plaintiff's failure to supply correct column load data to its architect. This failure, it is averred, delayed defendants and impaired their ability to apply for funds before the State Division of Local Finance. The Town, however, presents no evidence, by affidavit or otherwise, to show how the incorrect or missing data caused any delay or impairment. Moreover, as I noted in my discussion of defendants' claim of estoppel, the column load-apartment controversy, at least as far as it is presented by the Di Chiara affidavit of December 24, 1973, arose at such a late date that it could not explain any but the most recent delay · in the Town's construction

schedule, even if harm were shown. Clearly the Town failed to live up to the terms of the Agreement, no matter what its construction specifications; it cannot rely on bald assertions of impossibility devoid of the slightest factual support.

## II

Since defendants have failed to convince this court that their non-performance here is excused, or that any material fact is disputed as to that issue, I must deal with defendants' rather surprising contention that the Agreement they claim to have followed so diligently is itself invalid. In paragraph (d) of their Separate Defenses they claim "[i]nvalidity or partial invalidity of lease under New Jersey Constitution Article VIII, Section 3, Paragraphs 2, 3, N.J.S.A. 40A:12–15 or other pertinent constitutional or statutory provisions."

■ I shall first deal with the constitutional claim. The provisions in issue, Article VIII, § 3, ¶ 2, 3, read as follows:

2. No county, city, borough, town, township or village shall hereafter give any money or property, or loan its money or credit, to or in aid of any individual, association or corporation, or become security for, or be directly or indirectly the owner of, any stock or bonds of any association or corporation.

3. No donation of land or appropriation of money shall be made by the State or any county or municipal corporation to or for the use of any society, association or corporation whatever.

Defendants argue that the construction of the platform slab above the parking facility by the Town violates these provisions, apparently because it constitutes a gift, loans, or appropriation of money to the plaintiff, a private developer. The specifics of defendants' argument, however, are not to be found in either their briefs or their affidavits. Defendants also claim these constitutional provisions are violated by sections 13(f)

(viii) (a)–(c) and 13(f)(ix) of the lease Agreement. These provisions, in short, require the Town to operate the garage as a public parking facility at rates comparable to those charged by the Parking Authority, with a certain number of spaces available for long term parking at special rates and certain minimum hours of operation. Here too defendants fail to articulate how the State Constitution is violated by this arrangement. This court can only speculate, as does plaintiff, that defendants are attacking the "continued operation of the parking garage which incidentally benefits plaintiff's tenant." (Plf. Reply brief at 7.)

Plaintiff would have us hold that state strictures have no place in a federally-financed urban renewal project such as this, and that federal regulation was clearly intended to predominate in this situation. He cites Lehigh Construction Co. v. Housing Auth. of City of Orange, 56 N.J. 447, 267 A.2d 41 (1960) and Ott v. West New York, 92 N.J.Super. 184, 222 A.2d 541 (L.Div.1966), in support of this proposition. This court need not decide, however, whether there has been any preemption of state constitutional provisions in this situation, since the designated provisions of the Agreement clearly do not run afoul of the state constitutional proscriptions.

Whether the transactions at issue be deemed donations, loans, or contracts for adequate consideration, they are not unconstitutional, since they clearly serve a legitimate public purpose. In Roe v. Kervick, 42 N.J. 191, 217, 199 A.2d 834, 849 (1964), where a state statute granting federal and state funds to private persons engaged in urban renewal was held constitutional, this public purpose principle was explained:

> [I]f the purpose of a statute be public . . . the means of accomplishing it laid down thereby ought to be regarded as a matter of valid legislative policy so long as the means are restricted to the public end by the legislative and contractual obligation.

The New Jersey Supreme Court also found the concept of public purpose to be extremely broad. It found:

> Generally speaking it connotes an activity which serves as a benefit to the community as a whole, and, which, at the same time is directly related to the functions of government . . .
> To be serviceable it must expand when necessary to encompass changing public needs of a modern dynamic society
> . . . .

Roe v. Kervick, *supra* at 207, 199 A.2d at 842. *See also* Brody v. City of Millville, 114 N.J.Super. 94, 274 A.2d 849 (L.Div.1971), aff'd., 120 N.J.Super. 1, 293 A.2d 211 (App.Div.1972).

Under this standard, the conclusion is inescapable that the lease of the air rights to plaintiff, the construction of the slab for the shopping mall and the maintenance of the parking garage, are all in furtherance of a valid public purpose. The mere fact that the project seeks to replace an economically depressed and blighted area with an active business district which will provide many new jobs for local residents should be sufficient in itself to uphold the lease's validity. *See* Levin v. Township Committee, Bridgewater Tp., 57 N.J. 506, 274 A.2d 1 (1971); Roe v. Kervick, *supra*. But further, the new businesses established, retail and commercial, should provide substantial additional tax revenues for the Town government itself. As former Justice Francis rightly concluded, it is well settled that "improvement of the economic condition of the public by developing, stimulating and increasing the growth of new resources for the employment of capital and labor by private individual transactions" expressly promotes the general public welfare. Levin v. Township Committee, Bridgewater Tp., *supra*, 57 N.J. at 548, 274 A.2d at 24; Brody v. City of Millville, *supra*. Such a goal is undoubtedly the primary purpose of the undertaking agreed to by these parties.

Even if one disregards the public welfare aspects of the complex contemplated

by the Agreement, defendants make no showing that the arms-length pact between the Town and plaintiff is a disguised gift or donation. Section 4 of the Agreement specifically provides that plaintiff shall pay annual rent of $139,725 for use of the air rights and property of the four delivery phases. Furthermore, after completion, he may choose to purchase the entire property for $1,863,000 (section 12). This rental-purchase price is, of course, in addition to the substantial time and money expended by plaintiff in constructing the office building and eventually the mall above defendants' garage.

From the four corners of the Agreement, then, consideration for the mutual promises therein contained appears more than adequate. But even if the consideration given by plaintiff for the lease is in fact grossly insufficient and the Agreement thus unconstitutional, East Orange v. Bd. of Water Comm'rs., etc., 79 N.J.Super. 363, 191 A.2d 749 (App. Div.1962), aff'd., 41 N.J. 6, 194 A.2d 459 (1963), defendants offer no proof of such inadequacy by affidavit or otherwise. Brody v. City of Millville, *supra,* 114 N.J.Super. at 103, 274 A.2d 849.

In *Brody, supra,* the Court held valid a leasing arrangement similar to the one here at issue, against the same form of constitutional attack. The first agreement, signed in 1962, required the City of Millville to lease certain buildings at Millville Airfield to Airwork Corporation, a repairer of aircraft engines, for use in their business. In September 1968 the City and Airwork entered into a supplemental agreement obligating Airwork to construct a hangar, taxiway and apron for the facility in return for a 25-year lease of the buildings it would occupy at no rental with an option to re-rent. Further, in 1970 still another agreement was signed providing that the City would finance and construct another hangar for Airwork's use at $1.70 per square foot for a 20-year period.

■■■ In upholding this type of arrangement the court stated "[c]ertainly

the form that the transaction takes for the purpose of accomplishing the municipal benefit is not the criterion for determining the validity thereof." 114 N. J.Super. at 102, 274 A.2d at 853. This court shares this judicial philosophy and deems it peculiarly applicable to the case at bar. Moreover the *Brody* court and New Jersey Supreme Court in Whelan v. N. J. Power & Light Co., 45 N.J. 237, 212 A.2d 136 (1965), have held that the mere fact that a private advantage or profit may incidentally result from accomplishment of the public purpose in no way affects the validity of a transaction under Article VIII, § 3, ¶ 2, 3 of the New Jersey Constitution. Accordingly, any incidental benefit plaintiff herein derives from the parking garage or tenant rentals is not material to the constitutional issue defendants raise.

■■■ Defendants' statutory attack upon its own Agreement remains to be dealt with. They rely on N.J.S.A. 40A:12–15 (1973) which provides in pertinent part:

A leasehold for a term not in excess of 50 years may be made pursuant to this act and extended for an additional 25 years by ordinance or resolution thereafter for any county or municipal public purpose, including, but not limited to: [setting forth certain circumstances]

\* \* \* \* \* \*

In no event shall any lease under this ·section be entered into for, with, or on behalf of any commercial, business, trade, manufacturing, wholesaling, retailing, or other profit-making enterprise . . . .

This enactment, under other circumstances, would bode ill for the validity of the Agreement, since plaintiff undoubtedly opérates his business for profit and the lease runs for a term of 52 years, not 50, the statutory maximum. But on the undisputed facts before us the statute has no application.

The provision quoted above is but one part of the Local Lands and Buildings Law, N.J.S.A. 40A:12–1 et seq. which

the legislature specifically ordered to take effect July 1, 1971. N.J.S.A. 40A:12–30 (1973). Moreover 40A:12–28 makes clear that "any acquisition, sale, lease or exchange made prior to the effective date of this act, pursuant to any act repealed or amended pursuant to this act, is hereby validated, confirmed and continued. . . ." In light of the statutory command, the proscriptions of 40A:12–15 can have no effect upon this Agreement, made on July 8, 1970, almost a year before the statute's effective date.

■ If there be the slightest doubt as to the solely prospective application of the Act, the case law puts such uncertainty to rest. The controlling principle was clearly stated by Mr. Justice Goldberg in Greene v. United States, 376 U. S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964):

> [T]he first rule of construction is that the legislation must be considered as addressed to the future not to the past . . . [and] a retrospective operation will not be given a statute which interferes with antecedent rights . . . unless such [term] be "the unequivocal and inflexible import of the terms, and the manifest intention of the legislature."

quoting Union Pac. R. Co. v. Laramie Stock Yards Co., 231 U.S. 190, 199, 34 S.Ct. 101, 58 L.Ed. 179. *Accord,* Bruner v. United States, 343 U.S. 112, 72 S.Ct. 581, 96 L.Ed. 786 (1952); de Rodulfa v. United States, 149 U.S.App.D.C. 154, 461 F.2d 1240, cert. denied, 409 U.S. 949, 93 S.Ct. 270, 34 L.Ed.2d 220 (1972); International Brotherhood of Boilermakers, Etc. v. N.L.R.B., 114 U.S. App.D.C. 372, 316 F.2d 373 (1963); La Parre v. Young Men's Christian Ass'n. of the Oranges, 30 N.J. 225, 152 A.2d 340 (1959); Nichols v. Board of Education of Jersey City, 9 N.J. 241, 87 A.2d 894 (1952); Lascari v. Board of Ed. of Borough of Lodi, 36 N.J.Super. 426, 116 A.2d 209 (App.Div.1955). No such clear legislative intent has been demonstrated.

Since there is no dispute as to any material fact in this case, and I have concluded that defendants' asserted defenses are legally insufficient, I find that the Town and the Mayor and Board of Aldermen have breached the Agreement by their failure to commence construction of a parking garage and are thus liable for such damages as plaintiff may prove at a trial on the damage issue. Because of the somewhat unusual nature of the relief sought by plaintiff, however, a few comments upon its propriety in this instance are in order.

As I noted above, plaintiff requests, among other forms of relief, a *declaratory judgment* finding that defendants have breached the Agreement here in issue. Under the circumstances of this case, however, plaintiff would ordinarily be expected merely to sue for damages resulting from the alleged breach. Moreover, a request for damages for breach, certainly an act incompatible with the continued existence of the contract, could be construed as an election to discharge defendants from any further obligation to perform under the Agreement.

By bringing suit under the Declaratory Judgment Act, 28 U.S.C. § 2201, however, it is clear that plaintiff is not electing to avoid the contract on the basis of defendants' breach. Instead, to avoid waiver of breach by his subsequent performance, he asks for a declaration of defendants' liability for delays thus far encountered as a result of defendants' failure to perform, while continuing to assert his willingness, even obligation, to continue to operate under the allegedly breached Agreement.

■ Although the procedure plaintiff employs is not a common one, I find that it does no violence to either the requirements of the declaratory judgment remedy or the principles of the substantive law of contracts.

■ Initially, it is important to remember that declaratory judgment, while not, strictly speaking, an equitable remedy, is essentially equitable in na-

ture. Accordingly, decisions as to its use are committed to the sound discretion of the trial court. *Mechling Barge Lines v. United States,* 368 U.S. 324, 331, 82 S.Ct. 337, 7 L.Ed.2d 317 (1961); *Travelers Ins. Co. v. Davis,* 490 F.2d 536 (3d Cir. 1974); *Provident Tradesmens Bank & Trust Co. v. Lumbermens Mut. Cas. Co.,* 365 F.2d 802, 815 (3d Cir. 1966), *vacated on other grounds sub nom. Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968); *Wacker v. Bisson,* 348 F.2d 602, 610 (5th Cir. 1965). Unquestionably, then, this court has the right to grant a declaratory judgment pursuant to 28 U.S. C. § 2201, given the appropriate circumstances. Moreover, defendants do not question the propriety of the declaratory judgment remedy in this case, as distinguished from a questioning of the merits of plaintiff's claim.

The Federal Declaratory Judgment Act, 28 U.S.C. § 2201 provides:

> In a case of actual controversy within its jurisdiction, except with respect to Federal taxes, any Court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, *whether or not further relief is or could be sought.* [emphasis supplied]

The words of the Act itself make it perfectly clear that the real and present controversy between plaintiff and defendants concerning the extent of defendants' duties under the Agreement is one that is properly settled by declaratory action, despite the existence of an adequate remedy by means of a suit for damages. Moreover, Rule 57 of the Federal Rules of Civil Procedure expressly provides that another adequate remedy is no bar to a request for a declaratory judgment. As one authority has aptly stated: " . . . declaratory action is limited to no particular class of cases and is confined to no special type of litigation. Its scope is pervasive." 6A Moore's Federal Practice § 57.21[4] at

57–231. There is nothing before this court which suggests this case is outside that scope.

The granting of declaratory relief in the case of a dispute over a contractual duty has been approved despite the availability of ordinary damage remedies. In *Keener Oil & Gas Co. v. Consolidated Gas Utilities Corp.,* 190 F.2d 985, 989 (10th Cir. 1951), the court upheld the grant of a declaratory judgment to determine if activity contemplated by plaintiff would amount to a breach of contract. It was there stated:

> There existed an actual and continuing controversy between Keener and Consolidated as to whether the transportation by Consolidated, through its 14-inch line, of gas from the Elk City Field . . . would constitute a violation of the contract. . . . In such a situation, a party to the contract is not compelled to wait until he has committed an act which . . . will constitute a breach, but may seek relief by declaratory judgment, and have the controversy adjudicated in order that he may avoid the risk of damages or other untoward consequences.

Here, as in *Keener,* plaintiff is subject to substantial risks and "untoward consequences" if he can not obtain declaratory relief. If he performs under the Agreement without a determination that a breach has or has not been committed, he may be held to have waived any objection to defendants' delay. But if he considers himself discharged from his contractual obligation by defendants' alleged refusal to perform, he may, ironically, be held to have repudiated the contract if defendants' acts were not found to amount to a total breach of the Agreement. Without such a declaration, then, plaintiff will be plagued with the uncertainty and insecurity in his legal relations that the declaratory judgment was intended to avoid.

It is also noteworthy that the continuation of the mutual contractual obligations is no bar to a declaration of defendants' breach. In *City of Leominster*

v. Pittsburgh-Des Moines Steel Co., 201 F.Supp. 66 (D.Mass.1962), a situation similar to the one at bar arose. Plaintiff city requested a declaratory judgment defining the rights and liabilities of the parties to a contract between it and the defendant company. Defendant claimed that the entry of such a judgment was inappropriate in view of the existence of a cause of action for damages. The court disagreed, stating:

> Paragraph 10 of the plaintiff's petition . . . alleges that Pittsburgh Steel has an obligation to perform under the terms of the contract. Under the circumstances of this case, declaratory judgment procedure is available as a remedy, *particularly where the plaintiff alleges that it still has a contractual right based on an executory obligation.* The fact that the plaintiff may have another remedy which it could utilize does not preclude its use of the procedure chosen. [emphasis supplied]

201 F.Supp. at 68. *Cf.* 6A Moore's Federal Practice ¶ 57.10 at 51–76 to 77.

It is also clear under the law of contracts that plaintiff's suit is not premature, even though he has not "elected" to avoid the Agreement defendants have breached. As Professor Corbin explains, plaintiff may sue for damages while still demanding that performance commence. He finds:

> The unexcused failure of a contractor to render a promised performance when it is due is always a breach of contract for which an action for appropriate remedy can be maintained. . . . For a failure of performance constituting a "total" breach an action for remedies that are appropriate thereto is at once maintainable. Yet the injured party is not required to bring such an action. He has the option of treating the non-performance as a "partial" breach only and getting judgment therefor without barring a later action for some subsequently occurring breach. It is reasonable for him to expect performance

of the remainder of the contract as agreed and to ask a judicial remedy in case of disappointment.

4 A. Corbin, Contracts § 954, at 829–30 (1951). Therefore election is not a serious problem here where the remedies are concurrent, rather than inconsistent. Deerhurst Estates v. Meadow Homes, Inc., 64 N.J.Super. 134, 146, 165 A.2d 543 (App.Div.1960). Plaintiff certainly may bring suit on defendants "partial" breach.

Since there is nothing in the nature of the declaratory judgment remedy to prevent this court from acting upon plaintiff's claim as he has presented it, he need not risk either placing himself in breach or waiving his right to damages for defective performance to determine his legal position.

 While the Town's liability for money damages incident to its breach of contract is clear, the question of whether to decree specific performance of this Agreement is much more difficult. It must first be determined whether the remedy is appropriate at all. To be appropriate, money damages must be either inadequate to compensate plaintiff or be of such a nature as to make their calculation impracticable. 4 Pomeroys Equity Jurisprudence §§ 1401–03; 5 Williston on Contracts § 1423 (Rev.ed. 1937). Although there is some authority holding that shopping center lease arrangements qualify for such equitable relief, *see* City Stores Co. v. Ammerman, 266 F.Supp. 766 (D.D.C.1967), aff'd., 129 U.S.App.D.C. 325, 394 F.2d 950 (1968), other issues remain to be resolved.

 In the case at bar, for example, the course of action contemplated by defendants, the issuance of bonds, will apparently require the approval of the State Division of Local Finance and possibly further assistance from HUD. Recognizing a valid limitation upon judicial power in cases such as this, the courts have held that specific performance will not be decreed where compliance rests upon the will or discretion of

an uncontrolled third party, particularly a governmental body. *Popular Refreshments, Inc. v. Fuller's Milk Bar, etc.,* 85 N.J.Super. 528, 540, 205 A.2d 445 (App. Div.1964) ; *Di Cataldo v. Harold Corp.,* 15 N.J.Super. 471, 478, 83 A.2d 545 (Ch.Div.1951).

■ Moreover, here we deal with a contract requiring the construction of a not insubstantial structure by the Town. The rule in such situations was summarized by Judge Jayne in *Lester's Home Furnishers v. Modern Furniture Co.,* 1 N.J.Super. 365, 368, 61 A.2d 743 (Ch. Div.1948). He found:

> It may be said with reasonable certainty that courts of equity jurisdiction will not ordinarily undertake to enforce the performance of so-called building and construction contracts. The general policy inheres in the circumstance that in most instances damages at law constitute an available and adequate remedy and, additionally, in the practical inability of the court to compose a judgment or decree embracing with requisite precision the specifications of the work and to engage in the supervision of its performance.

Although there are numerous and well-founded exceptions to this rule, the inherent difficulty in enforcement of such an order remains.

■ I find it unnecessary to decide these difficult issues. Since the institution of this suit all parties have conferred in my presence, wherein it was made clear by the Town that all steps necessary to the approval of the bond issue by the State and the eventual construction of the garage are being taken with all possible speed. In fact, a schedule for the completion of the numerous steps in the bonding process has been submitted to this court by counsel for the Town. Under this schedule the bonds could be available for sale by February of 1974 at the latest and construction could apparently begin in March. While in no way offering any excuse for the Town's past delay in moving ahead on this project, I see no reason to embark upon the extraordinary remedy of specific performance if the Town is proceeding as diligently as it asserts. I, therefore, deny plaintiff's demand for specific performance of the Agreement at this time.

However, I also grant plaintiff leave to reopen this proceeding at any time that defendants, for whatever reason, do not keep reasonably close to their proposed time schedule.

### III

■ By way of plaintiff's motion for summary judgment on the recently added Fifth Count of his amended complaint, this court is asked to rule that a lease-back agreement between plaintiff and the Town, if entered into, would be exempted from the public bidding requirements of the New Jersey Local Public Contracts Law. N.J.S.A. 40A:-11–1 et seq. After careful analysis of this Count, the answer thereto, and the briefs and affidavits submitted by the parties, I find no case or controversy presented by this Count's allegations, and accordingly dismiss it on my own motion.

A repetition of some of the facts will help to reveal why this Count is beyond the pale of federal jurisdiction. In the months after the signing of the Agreement, the Town encountered substantial difficulty in obtaining the funds it required to finance the construction of its share of the project. Thus, in 1972, after it appeared that other attempts at financing would prove fruitless, plaintiff and the Town commenced negotiations toward the end of devising a plan whereby the Town would lease the property for the garage to plaintiff who would, in turn, construct the garage and lease it back to the Town. The rental from the lease-back would, in time, compensate plaintiff for his costs of construction.

These negotiations led in December 1972 to a proposed supplemental agreement incorporating lease-back provisions being submitted to the Town by plain-

tiff. Moreover, in March 1973 the local governing body passed a resolution authorizing the Town attorney to aid it in negotiating final arrangements for such a plan. But before any agreement was formally consummated, the Town attorney concluded that such an agreement would leave the Town vulnerable to a taxpayer's suit challenging its legality. Particularly troubling was that the contract price was to be negotiated between the parties rather than arrived at by a public bidding procedure. More specifically, the aforementioned recent Superior Court decision, Bulman v. McCrane, 123 N.J.Super. 213, 302 A.2d 163 (Ch. Div.1973), rev'd., 64 N.J. 105, 312 A.2d 857 (1973), voiding a similar arrangement entered into by the State of New Jersey, apparently caused great apprehension at that time.[5]

The governing body, following the recommendation of the Town attorney, approved another resolution abandoning the efforts toward the lease-back plan. As of this date, no lease-back plan or other similar plan has been approved.

An analysis of the Count in question reveals a reference to the Town's failure to commence construction, and its announced intention to let the instant contract by means of public bidding. In order to mitigate the damages occasioned by this delay, the complaint suggests, plaintiff agrees to offer his services as contractor for the garage construction, under certain conditions not of great import here. Moreover, plaintiff asserts, he is the only logical choice to assume the task under present conditions. Most enlightening, however, is plaintiff's prayer for relief. He demands judgment declaring: "defendants are not required to comply with public bidding statutes, and they *may* negotiate directly with plaintiff to be its general contractor to construct said parking garage . . . ." [emphasis added] In effect,

plaintiff asks that this court advise the Town of its future legal status assuming it ever enters into a lease-back agreement with plaintiff.

The Town, in its answer, responds by alleging that plaintiff's requested relief is violative of N.J.S.A. 40A:11–13, a provision of the Local Contracts Law requiring public bidding. The Town further avers that certain conditions of the contract plaintiff proposes are unacceptable to it, even if a negotiated form of contract is held to be legal. The Town does not admit any obligation to enter into any such agreement, even if it is declared legal, nor do I perceive any.

 Article III of the Constitution conditions the exercise of the federal judicial power upon the existence of a justiciable case or controversy. S.E.C. v. Medical Committee for Human Rights, 404 U.S. 403, 407, 92 S.Ct. 577, 30 L. Ed.2d 560 (1972); Benton v. Maryland, 395 U.S. 784, 788, 89 S.Ct. 2056, 23 L. Ed.2d 707 (1969); Super Tire Engineering Co. v. McCorkle, 469 F.2d 911, 914 (3d Cir. 1972). Although the existence of the requisite case or controversy is not always easy to determine, "basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

 Article III courts will not render mere advisory opinions on disputes of an abstract, hypothetical or contingent character. Golden v. Zwickler, 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); United Public Workers of America v. Mitchell, 330 U.S. 75, 67 S. Ct. 556, 91 L.Ed. 754 (1947); Alabama Federation of Labor v. McAdory, 325

5. Although the *Bulman* case was cited as a major factor in the sudden reversal by Alderman Goodman in his affidavit, briefs submitted by the Town and plaintiff analyzing the effect of its reversal on this case indicate that neither party believes it is of major significance to the questions before this court.

U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945); Magaziner v. Montemuro, 468 F.2d 782, 784 (3d Cir. 1972); Nationwide Mutual Ins. Co. v. Fidelity & Cas. Co., 286 F.2d 91 (3d Cir. 1961). More specifically, "[i]t must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be on a hypothetical set of facts." Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 240–241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937). *See also* North Carolina v. Rice, 404 U.S. 244, 92 S.Ct. 402, 30 L.Ed.2d 413 (1972). Without such requirements the judiciary would be compelled to resolve disputes without benefit of the sharp focusing of issues brought about by a clash of truly adversary interests.

The case before us clearly falls far short of this minimum constitutional standard. Since the Town has not thus far agreed to enter into any lease-back or similar arrangement with the plaintiff, the entire factual basis for the dispute presented in the Fifth Count is hypothetical. A declaration by this court that public bidding is unnecessary to consummate this type of agreement (however it may be defined in the absence of a binding contract) is of no import if, for any reason whatever, the Town chooses not to become bound to such a contract. The controversy is, at best, a contingent one.

Furthermore, plaintiff's Fifth Count and defendants' answer thereto amount to no more than a non-justiciable "friendly suit". *See* Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911). Although there is no doubt that plaintiff has tangible pecuniary interest in a declaration that the proposed type of agreement is legal, defendants' interest in such a declaration is, if anything, identical rather than adverse to plaintiff's. *See* Moore v. Charlotte-Mecklenburg Bd. of Ed., 402 U.S. 47, 91 S.Ct. 1292, 28 L.Ed. 590 (1971). Such an agreement, if declared legal by

this court and accepted by the Town, provides the Town with an opportunity to avoid much of its financing difficulty and to fulfill its outstanding contractual obligation to plaintiff. If the form of the agreement were to be declared illegal, however, the Town would, at best, suffer no change in the *status quo* and, at worst, find one more avenue. leading out of its contractual morass closed. Taken in its most favorable light, then, the suit lacks the "adverse legal interests" Article III adjudication demands. Maryland Cas. Co. v. Pacific Coal & Oil Co., *supra*.

Clearly both parties herein merely seek legal advice so that they might avoid a future controversy with local taxpayers arising from the Town's commitment to a contract of questionable legality. Unfortunately the Constitution constrains this court from offering the desired assistance.

██ Nor does it appear, taking a practical view, that a decision by this court would resolve the question of legality, even if that question was ripe for adjudication. Since jurisdiction in this matter is based upon diversity of citizenship, this court must predict how a New Jersey state court would decide the novel issues raised here. Schein v. Chasen, 478 F.2d 817, 821 (2d Cir. 1973); New Amsterdam Cas. Co. v. First Pennsylvania B. & T. Co., 451 F.2d 892 (3d Cir. 1971); Western Pennsylvania Nat'l Bank v. American Cas. Co. of Newark, N. J., 428 F.2d 1220 (3d Cir. 1970). Due to this limited role given to federal courts under the doctrine of Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), an aggrieved citizen with standing would neither be bound by my determination nor restrained from immediately bringing suit in state court enjoining any contemplated action. In Western Pennsylvania Nat'l Bank v. American Cas. Co. of Newark, N. J., *supra*, for example, the Third Circuit Court of Appeals reversed a district court decision in a diversity case solely on the ground that a

**1081**

Pennsylvania appellate court had decided the issue contrary and subsequent to an *Erie* prediction by the district court.

For the foregoing reasons, then, the Fifth Count of the complaint is dismissed.

Submit an appropriate form of order or judgment.