106 N.J. Super. 88 (1968)
254 A.2d 313
CITY OF NEWARK, A MUNICIPAL CORPORATION OF NEW JERSEY, PLAINTIFF,
v.
NORTH JERSEY DISTRICT WATER SUPPLY COMMISSION, A PUBLIC AGENCY, AND TOWN OF BLOOMFIELD, TOWN OF NUTLEY, TOWN OF KEARNY, BOROUGH OF WEST CALDWELL, CITY OF ELIZABETH, TOWNSHIP OF CEDAR GROVE, BOROUGH OF GLEN RIDGE, VILLAGE OF SOUTH ORANGE, BOROUGH OF VERONA AND CITY OF BAYONNE, MUNICIPAL CORPORATIONS OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided December 6, 1968.
*92 Mr. Philip E. Gordon for plaintiff.
Mr. Oscar R. Wilensky for defendant North Jersey District Water Supply Commission.
Mr. Paul J. McCurrie for defendant Town of Kearny.
Mr. John J. McDonough for defendant Borough of West Caldwell.
Mr. Joseph A. DeStefano for defendant Township of Cedar Grove.
Mr. George H. Callahan for defendant Borough of Glen Ridge.
*93 Mr. Emil E. Mascia for defendant Borough of Verona (Messrs. Sarcone & Mascia, attorneys).
MINTZ, J.S.C.
Plaintiff, City of Newark, seeks an adjudication rescinding two water supply contracts entered into between defendant North Jersey District Water Supply Commission (hereinafter referred to as "Commission"), Newark and a number of other municipalities.
The Commission moves for summary judgment on the ground that there exists no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. At the oral argument, defendants Town of Kearny and the Borough of Glen Ridge joined in the Commission's motion. Defendants Township of Cedar Grove and Borough of West Caldwell expressed their desire to withdraw from the Raritan Valley water project as presently constituted and opposed the motion for summary judgment. Defendant Borough of Verona opposed the motion for summary judgment on the ground that one of the water supply contracts requires clarification respecting that Borough's obligation therein.
The Commission and several municipalities executed a contract dated July 13, 1965 for the supply of additional water to the heavily populated and industrialized northeastern section of New Jersey. Newark became a signatory to the contract on October 1, 1965. The contract did not become operative until September 12, 1966 when the requisite minimum subscription level of 50 million gaillons daily was reached.
On April 6, 1966 Newark entered into a second and independent agreement entitled "Cooperation Agreement Between City of Newark  North Jersey Water Supply Commission  Contracting Municipalities" (hereinafter referred to as "cooperation agreement"). Pursuant to its option terms, several of the participating municipalities became parties to this agreement. Its purpose was to facilitate the carrying out of the basic contract by permitting the contracting municipalities to utilize Newark's distribution system or to exchange *94 water to be obtained from the State's Round Valley-Spruce Run reservoirs and the Raritan River (hereinafter referred to as "Raritan Valley water") for water from Newark's Wanaque supply.
Throughout the period of negotiations the parties were apprised of the fact that the figures that they were working with were only estimates, subject to fluctuation resulting from changes in interest rates, the costs of materials and labor, and the total subscription level. In February 1967 Newark, apparently dissatisfied with the arrangement, passed a resolution and ordinance rescinding the two contracts. The Commission then instituted an action in which it sought an adjudication that the two contracts were valid and binding upon the signatories. The trial court entered such a judgment on February 9, 1968. North Jersey District Water Supply Commission v. City of Newark, et al., 103 N.J. Super. 542 (Ch. Div. 1968).
Ten days after this judgment was entered the Gilbert Associates Report was made available to all the participating municipalities. This report promulgated four alternate plans for the project. In possession of this report, Newark, on March 13, 1968 filed an appeal to the Appellate Division. Certification was granted and the matter was argued before the Supreme Court on June 4, 1968. On June 28, 1968 the trial court's judgment was affirmed. 52 N.J. 134 (1968).
In a letter dated July 1, 1968 the City of Newark through its Mayor wrote the Commission that events have transpired since the hearing in the Chancery Division on December 15, 1967 which render inequitable any insistence by the Commission upon the performance of the contracts by Newark. The letter stated that the contractual undertakings have been altered beyond any reasonable contemplation by the parties at the time they entered into the agreements, and performance has been rendered economically unfeasible. The Mayor concluded that "In view of the foregoing it is entirely inadvisable that the Commission proceed at this time or in the foreseeable future toward implementing any bonding negotiations, *95 or toward any further action with respect to the entire project."
On August 15, 1968 the Commission, in order to provide temporary financing, adopted a resolution authorizing the issuance of its bond anticipation notes in a sum not exceeding $4,500,000 in furtherance of the Raritan Valley project estimated to cost $51,226,182. To market the proposed bond anticipation notes, the Commission must certify that there is no litigation pending. The effect of the present suit is to thwart the project.
The gravamen of Newark's complaint is set forth in Paragraph 5 which recites that:
"5. From and after the date of the rendition of the judgment of the Chancery Division as aforesaid, the following matters have occurred, rendering inequitable any insistence by the defendant Commission upon the performance of the aforesaid agreements by the plaintiff:
a. The contractual undertakings of the plaintiff, as now projected by the defendant Commission, have been altered, physically and financially, far beyond any reasonable contemplation of the parties at the dates of such agreements, rendering the project and undertaking economically unfeasible.
b. When the 1965 contract was entered into, the anticipated cost for Raritan Valley water was between $165 and $185 per mg (million gallons).
c. The defendant Commission's engineers, Gilbert Associates, completed a study of the Raritan Valley transmission facilities, which was submitted for review to the plaintiff on or about February 19, 1968. In this study, there was recommended construction of a treatment plant and transmission facilities extending from Bound Brook to Newark, under an Alternate Plan 1A, which would have a capacity of 70 mgd (million gallons daily) at an estimated cost of between $217 and $251 per mg. This is the project adopted by defendant Commission. Because of high interest rates presently anticipated, it is realistic to use $250 per mg as the estimated base cost under such study.
d. The base cost was estimated at the designed capacity of 70 mgd, therefore, all the municipalities participating in this project, including the plaintiff, will have to pay for the difference between the 70 mgd designed capacity and the 61 mgd commitment of the participating municipalities. This will add approximately $29 per mg to the base cost.
e. The plaintiff cannot accept the Raritan Valley water without making improvements to the plaintiff's internal distribution system, to receive the designed capacity of 70 mgd, at an approximate cost to *96 the plaintiff of over $7,000,000. This the plaintiff is not obligated to do under the 1966 agreement, * * *.
f. The defendant Commission's latest estimates show that it will cost an additional $30 per mg to filter Wanaque water and, in the above mentioned cooperation agreement, * * * this cost must be arbitrated. Therefore, it is possible that this cost of $30 per mg will have to be added to the base cost.
g. Considering the factors aforementioned, the total unit cost of raw water from the Raritan Valley system may rise to at least $309 per mg.
h. If the plaintiff is forced to pass this cost of water on to its customers, it will become financially unsound for many of Newark's industrial and commercial users to continue to locate in Newark, and Newark will be unable to attract new industry and commercial businesses that may use substantial quantities of water, since Newark would have to raise substantially the present retail water charge to large consumers in Newark. Also affected would be all the water consumers in Newark, the home owners, in multiple dwellings, apartment houses, office and commercial buildings and factories, as well as the wholesale rate charged out-of-town consumers.
i. Elizabethtown Water Company now provides Newark with Raritan Valley water at a cost of $132 per mg."
In its motion for summary judgment, the Commission urges that the prior litigation between the parties is res judicata or, in the alternative, the City of Newark is collaterally estopped from raising the issue of economic unfeasibility resulting from the alleged unforeseen increase in the cost of the project. In opposition Newark, equating economic unfeasibility with impossibility of performance, argues that the issue of impossibility of performance was neither presented to nor considered by the trial court or Supreme Court in the prior action. It claims support for its position in the opinion of the Supreme Court, supra, wherein the court stated:
"* * * On argument before us, Newark challenged only the portion of the judgment below which sustained the basic contract between the Commission and Newark that became operative on September 12, 1966. The attack presented is the same as that advanced below, i.e., the contract is void because its provisions for determination of the price to be paid by Newark for water are too vague and uncertain to be enforceable." at p. 136.
*97 However, a review of the trial court's opinion and of the transcript of the oral argument before the Supreme Court indicates that Newark brought to the attention of both courts the anticipated increased cost of the Raritan Valley water. The trial court in the earlier litigation noted that the City of Newark suggested that costs may be greater than were first anticipated or projected by the Commission and stated:
"* * * Even if this be so it is no warrant or justification for the action taken by the City. An estimate is not a guaranty. If any of the contracting municipalities saw fit to rely upon estimates presented by the Commission they may not now be heard to complain if, because of lapse of time or otherwise, some revision seems probable. * * *"
Before the Supreme Court counsel for Newark raised the argument of increased costs and specifically referred to the impact of the Gilbert Associates Report. Additionally, the fact that Newark would be required to expend approximately $7,000,000 in order to absorb the water from the Raritan Valley project and to exchange or transmit this water through the City's water system was brought to the attention of the Supreme Court. Perhaps the Supreme Court was unimpressed with these arguments for it gave no consideration to the same in its opinion.
Notwithstanding the foregoing, Newark urges that the Commission in the prior suit sought only an adjudication determining the validity of the basic contract and cooperation agreement. It argues that the matter of increased costs was presented to the Supreme Court only in support of its argument that the contracts were vague and uncertain and that the issue of economic unfeasibility was not raised or decided in that suit.
Newark contends that it could not assert the defense of economic unfeasibility before the Supreme Court because it was not until August 15, 1968 that the Commission adopted its bond resolution approving Plan 1A of the Gilbert Associates Report. However, on oral argument before this court, *98 Newark's counsel conceded that when the Gilbert Associates Report was received on February 19, 1968 Newark deemed all of the proposed plans in that Report economically unfeasible and unacceptable. Further, the letter of July 1, 1968 from the Newark Mayor to the Commission was written prior to the Commission's decision to adopt Plan 1A. Hence, it clearly appears that before and during the pendency of the appeal in the prior suit Newark was aware of all the pertinent facts it now urges in this proceeding.
In view thereof, the defense of impossibility of performance should have been interposed in the earlier proceeding. Although the facts upon which such defense would be grounded were not known to Newark until ten days after the entry of the judgment by the trial court, Newark could have followed any of the available procedural avenues to protect its substantive rights. Specifically, Newark could have moved to stay the judgment pursuant to R.R. 1:4-6, 1:4-7 and to vacate the judgment under R.R. 4:62-2.
The Gilbert Associates Report, if not newly discovered evidence within the meaning of R.R. 4:62-2(b), did afford a basis for a motion to be relieved for "any other reason justifying relief from the operation of the judgment or order." R.R. 4:62-2(f). If the trial court deemed that such evidence or subsequent event occurring ten days after the entry of its judgment warranted liberation from the operation of the judgment, it could have granted relief pursuant to said rule. Gallanthen v. Postma, 12 N.J. Super. 464 (App. Div. 1951); cf. Turco Products v. Hydrocarbon Chemicals, 18 N.J. 130 (1955). Furthermore, when the appeal was argued before the Supreme Court, Newark could have but did not request that court to remand the case to the trial court for consideration of the new issue of economic unfeasibility.
While this court has the power in a proper case to entertain an independent action to relieve a party from a judgment, the policy of our law is to prevent the fragmentation of litigation and to require that relief from a final *99 judgment of a court of this state be sought in the action in which the judgment was rendered when that remedy is adequate. Shammas v. Shammas, 9 N.J. 321 (1952). Under our "single controversy" doctrine courts of this state are determined to enforce the prime aim of the new practice for the just and expeditious determination in a single action of the ultimate merits of an entire controversy between litigants. Thus in failing to assert economic unfeasibility in the prior action, Newark is now precluded from asserting such claim in this action. Falcone v. Middlesex County Med. Soc., 47 N.J. 92 (1966).
It also follows that since the facts herein alleged in support of Newark's complaint to rescind the two water supply contracts could have been asserted to defeat the Commission's claim in the prior suit in which it sought an adjudication respecting the binding effect of the two contracts, the first suit is res judicata of the issues raised here. The judgment of a court of competent jurisdiction on a question of law or fact or on a mixed question of law or fact, once litigated and determined, is, so long is it stands unreversed, conclusive upon the parties and their privies. Reeves v. Jersey City, 30 N.J. Super. 392 (App. Div. 1954), affirmed 16 N.J. 529 (1954); Hudson Transit Corp. v. Antonucci, 137 N.J.L. 704 (E. & A. 1948); Bango v. Ward, 12 N.J. 415 (1953). The court in Reeves, supra, also stated:
"* * * where such prior judgment is founded on the claim or demand sued upon in the later suit, it is conclusive not only as to all matters which were actually litigated and decided, but also as to all matters which might have been properly raised in said prior suit." at p. 400 (Emphasis supplied)
To the same effect see Public Service Electric & Gas Co. v. Waldroup, 38 N.J. Super. 419 (App. Div. 1955); Middlesex Concrete, etc., Corp. v. Borough of Carteret, 35 N.J. Super. 226 (App. Div. 1955); Ferger v. Local 483, 94 N.J. Super. 554, 564 (Ch. Div. 1967), affirmed 97 N.J. Super. 505 (App. Div. 1967).
*100 The principle of res judicata or collateral estoppel does not bar relitigation where, after the rendition of the judgment, subsequent events or conditions occur, thus creating a new legal situation or altering the legal rights or relation of the parties. A judgment cannot be conclusive as to rights which were not in existence at the time of its rendition. Lasasso v. Lasasso, 1 N.J. 324, 328 (1949); Washington Township v. Gould, 39 N.J. 527, 533 (1963); Board of Directors of Ajax, etc. v. First Nat. Bank of Princeton, 33 N.J. 456, 464, 465 (1960).
But as already observed the subsequent events herein relied upon by Newark were known to it before the appeal was filed and more than three months before it was argued before the Supreme Court. The trial court judgment entered on February 9, 1968 was but an interim step in the proceeding. Falcone v. Middlesex County Med. Soc., supra. Thus the issues raised in the present litigation, if not argued in the prior suit, could have been raised therein by Newark and accordingly cannot be asserted in this action.
Assuming arguendo that the plaintiff's action is not precluded, the affidavits submitted by Newark in connection with this motion raise no genuine issue of fact. It is urged in Paragraph 5e of the complaint that Newark will be required to expend approximately $7,000,000 in order to absorb, transmit or exchange the Raritan Valley water through its transmission system (60 inch main). Newark has indicated that it will claim a charge of $30.07 per million gallons from each municipality which is a party to the cooperation agreement to cover the $7,000,000 expenditure. This sum is in addition to the presently anticipated base cost of $250 per million gallons for such water. Clearly the parties considered that some expenditure would be necessary for one of the preambles to the 1966 cooperation agreement states:
"WHEREAS, detailed engineering and cost studies will be required to determine such methods and costs incurred or to be incurred directly or indirectly by Newark, attributable to such supplemental *101 transmission or exchange of supplies with the said Contracting Municipalities; * * *."
The municipalities may of course contest this claim in arbitration, as provided for in said agreement. However, assuming Newark will be required to ultimately bear this cost, it is an item that was within the contemplation of the parties when the agreement was signed.
It is also argued that while Newark's 60 inch main can handle the minimum anticipated demand of 65.675 million gallons daily, it cannot accommodate the projected maximum requirement of 123.6 million gallons daily which includes the demand of the Elizabethtown line. When Newark entered into the basic contract it was aware that the nearly completed Elizabethtown line would furnish between 10 and 30 million gallons daily and would further tax its transmission system. Yet with this knowledge, it executed the two water supply contracts. It is further noted that the 1966 cooperation agreement expressly states that Newark shall not be required to exchange or transmit, with or to any municipality, beyond Newark's present capacity to absorb "exchange" waters into its system and that the transmission system contemplated to be utilized shall consist solely of the 60 inch water main owned by Newark. Perhaps in order to absorb and distribute the additional water, some supplemental arrangements may be necessary. However, this will not prevent the parties from performing their obligations under the contracts.
In Paragraph 5d of the complaint it is alleged that the base cost was estimated for the designed capacity of 70 million gallons daily and that the participating municipalities who are committed to approximately 61 million gallons daily will have to pay the difference between the 70 million gallons daily designed capacity and the present subscription level of 61 million gallons daily. This will add approximately $29 per million gallons to the base cost. The 1965 agreement expressly provides that it becomes effective upon the Commission and the contracting municipalities when a proprietary *102 allotment aggregating at least 50 million gallons daily is reached. A capacity subscription level was not a condition precedent to the effectuation of the contract. Hence the parties to that agreement contemplated that they would have to pay the difference between the 70 million gallons daily designed capacity and the present commitment of 61 million gallons daily. Furthermore, this added cost is only temporary for in due time it is anticipated that the presently available 9 million gallons daily will be sought by some municipality.
In paragraph 5 f of the complaint it is alleged that the Commission estimates it will cost an additional $30 per million gallons to filter the Wanaque water and in the cooperation agreement this cost must be arbitrated and will possibly be added to the base cost. The parties to the cooperation agreement specifically contemplated the possibility that the State Department of Health may require that filtered water from Newark's Wanaque water supply be exchanged for filtered Raritan Valley water. Therefore, they provided for the arbitration of any claim by Newark against any contracting municipality for reimbursement of filtration costs should that municipality contest the charge. Furthermore, since filtration of Newark's Wanaque water supply is required independently of the Raritan Valley water project, an allocation of such costs to the Raritan Valley project seems unwarranted.
In any event all the factors which Newark now complains will add to the present realistic base cost of $250 per million gallons were present and contemplated by the parties when the basic contract and the cooperation agreement were executed.
Plaintiff's complaint further alleges that the presently anticipated cost of the Raritan Valley water to Newark may rise to $309 per million gallons. The proof indicates that if the questionable expenditure of approximately $7,000,000 is made for improvements to Newark's internal distribution system, the ultimate cost of the water to *103 Newark may possibly rise to $339 per million gallons as against a maximum estimated cost of $185 per million gallons when the 1965 contract was executed. Assuming this to be so, such evidence is insufficient to raise a factual or legal issue of impossibility of performance. At best the proof suggests that the cost of the project now appears to be higher than originally estimated. There is no "escape clause" in either agreement. As already observed, an estimate is not a guaranty. North Jersey District Water Supply Commission v. City of Newark, et al., supra. This court cannot relieve municipalities from hard bargains simply because alleged as such. Municipal contracts stand on the same footing as contracts between natural persons and courts will not inquire into the reasonableness of the terms of such contracts in the absence of bad faith, fraud or capricious action. Middlesex County Sewerage Authority v. Borough of Middlesex, 74 N.J. Super. 591 (Law Div. 1962), affirmed 79 N.J. Super. 24 (App. Div. 1963).
In Schaefer v. Brunswick Laundry, Inc., 116 N.J.L. 268, 271 (E. & A. 1936) the court stated:
"Generally, impossibility of performance offers no relief from the performance of contractual obligations, whether the impossibility could or could not have been foreseen at the time of the making of the contract. Middlesex Water Co. v. Knappmann Whiting Co., 64 N.J.L. 240. There are three exceptions to this rule: (1) where the impossibility arises by operation of law (Vanderbilt v. Little, 51 N.J. Eq. 289); (2) where a thing necessary to performance is destroyed (Matthews Const. Co. v. Brady, 104 N.J.L. 438); (3) where the contract calls for personal services, and the party to perform or receive performance dies (Victory v. Union County Trust Co., 4 N.J. Misc. 908). * * *"
In Edwards v. Leopoldi, 20 N.J. Super. 43 (App. Div. 1952) the court observed that the above stated rule is not universally applicable and has been commonly applied in cases in which the promissor guaranteed or warranted the performance or assumed the risk of impossibility. It further observed, at p. 53:
*104 "The rule in equity has been that it will not relieve against hardship arising from bad judgment, miscalculation or from a change in circumstances or the result of subsequent events, where these should have been in the contemplation of the parties as possible contingencies when they entered into the contract."
The same rule was applied in Lincoln Bus Co. v. Jersey Mutual, etc., Co., 112 N.J. Eq. 527 (Ch. 1933) where the court approvingly quoted from 5 Pom. Eq. Jur. 4958 as follows:
"`Subsequent events, which should have been contemplated. No defense.  Courts of equity frequently state the rule to be that the hardship and unfairness must be judged of in relation to the time of making the contract, and that specific performance will not be refused because of hard conditions brought about by subsequent events, or changes in circumstances. A more accurate formulation of the rule is this: equity will not relieve against hardship arising from a change in circumstances or the result of subsequent events, where these should have been in contemplation of the parties as possible contingencies, when they entered upon the agreement. And of such nature are the ordinary changes like a rise or fall in values, profits or loss in the undertaking, mistakes of judgment, unforeseen events, which yet were fairly possible contingencies, &c. Thus, no hardship arising from a great change in values between the time of making of the agreement, and the conveyance can be a ground for any relief. Nor can hardship arising from bad judgment, miscalculation, or changes of conditions that ought fairly to have been in contemplation of the defendant be considered by the court.'"
See also The Superintendent and Trustees of Public Schools of the City of Trenton v. Bennett, 27 N.J.L. 513 (Sup. Ct. 1859); Huyler's v. Ritz-Carlton Restaurant and Hotel Company of Atlantic City, 1 N.J. Misc. 64 (Sup. Ct. 1923); Costa v. Cranford, 75 N.J.L. 542 (E. & A. 1907); Earlin v. Mors, 1 N.J. 336 (1949); Hopper v. Hopper, 16 N.J. Eq. 147 (Ch. 1863).
Mineral Park Land Co. v. Howard et al., 172 Cal. 289, 156 P. 458, L.R.A. 1916 F. 1 (Sup. Ct. 1916) relied upon by Newark is distinguishable on its facts. There the contract on the part of the defendants to take all gravel and earth needed for certain work from plaintiff's land could not be fully performed *105 except at 10 or 12 times the usual cost since there was not enough gravel and earth on the land without taking that which was under water. The court held that under the circumstances it was impossible for the defendants to perform and stated:
"`A thing is impossible in legal contemplation when it is not practicable; and a thing is impracticable when it can only be done at an excessive and unreasonable cost.' 1 Beach on Contr. § 216. We do not mean to intimate that the defendants could excuse themselves by showing the existence of conditions which would make the performance of their obligation more expensive than they had anticipated, or which would entail a loss upon them. But, where the difference in cost is so great as here, and has the effect, as found, of making performance impracticable, the situation is not different from that of a total absence of earth and gravel."
As already noted in the instant situation the revised cost for the Raritan Valley water is less than twice the amount of the original estimate. Furthermore, our decisional law clearly indicates that subsequent events which should have been in the contemplation of the parties as possible contingencies when they entered into the contract will not excuse performance. New Jersey does not subscribe to the view that a thing is impossible in legal contemplation simply because it is not practicable to perform except at an excessive and unreasonable cost.
Clearly the parties to the two agreements knew they were dealing only with estimates. An increase in the interest rate, the major factor in the revised estimate of cost, was a contingency that was or should have been in the minds of the representatives for the contracting municipalities in 1965 and 1966. Hence the alleged prohibitive cost of the Raritan Valley water will not excuse the municipalities from performing under the stated agreements.
Furthermore, considering the need, the revised cost of the Raritan Valley water although high cannot be deemed prohibitive. Newark's present water consumption is estimated to be between 100 and 110 million gallons daily. Accepting *106 the figure of 110 million gallons, the current cost is $68 per million gallons. To this figure may be added the anticipated filtration cost of $30 for a total of $98 per million gallons. When this figure is averaged with the cost of Newark's proposed new supply of 15 million gallons of Raritan Valley water at $300 per million gallons, the combined cost to the City will approximate $122 per million gallons for bulk water. The price of the new water includes amortization of the construction costs for the water facility.
This combined figure represents an increase of $.18 per month in water charges to the average family of four using 200 gallons per day. There will not be, as Newark alleges, a 50% increase to large industrial and commercial users of water. Rather, there will be an increase to all consumers which will reflect the addition of the Raritan Valley water which will constitute approximately one-eighth of Newark's total supply. Assuming that the Raritan Valley water will cost $339 per million gallons, the combined cost will average about $127 per million gallons. There is no proof in the record that such cost will discourage large industrial and commercial users of water from locating in Newark. On the contrary, Mr. Dean C. Noll, an engineer for the Commission, states in his affidavit that $122 per million gallons is "admittedly a very cheap price for bulk water", and that Newark would still retain the advantage of attracting large industrial water users to the City when this cost is compared with the bulk cost for water in other municipalities.
Under all the stated circumstances, the Commission has shown that there is no basis in fact or in law for Newark's contention that the proposed project is economically unfeasible.
The position taken by the Borough of Verona affords no bar to the Commission's motion for summary judgment. Verona does not contest the validity of the basic contract, but its counsel stated that it seeks clarification of its obligation under the cooperation agreement. As already noted, this is a matter to be determined by arbitration. The *107 Township of Cedar Grove's plight is in good measure due to the fact that while it requires only 1 1/2 million gallons daily, it agreed to receive a proprietary allotment of 2 1/2 million gallons daily. Thus it will be paying for water which it may not presently need. However, this was known to the municipality at the time it signed the agreement and the commitment was made with a view toward anticipating the future needs of that municipality. The Borough of West Caldwell as well as Verona and Cedar Grove generally objects to the alleged excessive cost of the Raritan Valley water. However, all the factors which contribute to the increased cost were within the contemplation of these parties at the time they entered into the two water supply contracts. Therefore, they cannot assert impossibility of performance.
The Raritan Valley water will be expensive but it represents the culmination of efforts expended over a decade by the State, the Commission and a number of municipalities to make available this additional needed water supply. I am mindful of the rule that the moving parties for summary judgment have the burden of establishing the absence of any genuine issue as to all the material facts which, under applicable principles of substantive law, entitle them to judgment as a matter of law. Knutsen v. Brown, 93 N.J. Super. 522, 530 (Law Div. 1966), affirmed 96 N.J. Super. 229 (App. Div. 1967); Judson v. People's Bank and Trust Co. of Westfield, 17 N.J. 67 (1954). I am satisfied that the moving parties have sustained their burden. Accordingly the motion for summary judgment is granted.
An appropriate form of judgment will be submitted, consented to as to form or to be settled on notice.