EDWARD R. MCMAHON, COURT–APPOINTED RECEIVER FOR
ONE WASHINGTON PARK URBAN RENEWAL ASSOCIATION
AND WGL ASSOCIATES, PLAINTIFF–APPELLANT, v. CITY OF
NEWARK, CITY OF NEWARK DEPARTMENT OF FINANCE,
OFFICE OF ASSESSMENT AND EVELYN E. LACCITIELLO,
TAX ASSESSOR, DEFENDANTS–RESPONDENTS.

Argued March 26, 2008—Decided July 17, 2008.

528

*Dennis J. Drasco* argued the cause for appellant (*Lum, Drasco & Positan*, attorneys; *Mr. Drasco* and *Kevin J. O'Connor*, on the briefs).

*John R. Lloyd* argued the cause for respondents (*Nowell Amoroso Klein Bierman*, attorneys).

Justice RIVERA–SOTO delivered the opinion of the Court.

The primary question in this appeal requires that we harmonize disparate provisions of the now-repealed Urban Renewal Corporation and Association Law of 1961 (Fox–Lance Law),[1] formerly *N.J.S.A.* 40:55C–40 to –76, with the comprehensive statutory appeal and review procedures for real estate tax appeals.

Specifically, in this appeal the taxpayer and the municipality had agreed that, in order to encourage a significant urban renewal project, the taxpayer would be exempt from real estate taxes and would pay a defined annual service charge in lieu thereof. More

---

[1] The provisions of the Fox–Lance Law, *N.J.S.A.* 40:55C–40 to –76, as well as the entirety of the Urban Renewal Nonprofit Corporation Law of 1965, *N.J.S.A.* 40:55C–77 to –108, were repealed by *L.* 1991, *c.* 431, § 20 (eff. Apr.17, 1992), and were replaced by the Long Term Tax Exemption Law, *N.J.S.A.* 40A:20–1 to –22. *See Town of Secaucus v. City of Jersey City*, 20 *N.J. Tax.* 384, 392 (Tax 2002) (explaining that Long Term Tax Exemption Law "replaced the Fox–Lance Law in 1992").

to the point, the taxpayer and the municipality had agreed that any dispute between them would be heard either in the Superior Court or in arbitration. The municipality later asserted that the taxpayer had lost its exemption, and the municipality's tax assessor issued an added/omitted assessment for the property. Faced with that dispute, and instead of filing a tax appeal to the Tax Court within the time period allowed by law, *N.J.S.A.* 54:4–63.11, the taxpayer filed an action in the Superior Court seeking declaratory and injunctive relief. Although that lawsuit eventually was transferred to the Tax Court, the transfer occurred too late to invoke the Tax Court's appellate jurisdiction and, hence, the taxpayer was deemed bound by the added assessment.

■ Because the timely filing of a tax appeal is jurisdictional, an untimely tax appeal is not cognizable and the tardy taxpayer is bound by the assessment as issued. However, when, as here, a taxpayer and the municipality have agreed in a detailed, arm's-length writing that their disputes are to be resolved in a different forum, the forum selection agreement will take precedence and its terms must be honored.

## I.

In March 1981, One Washington Urban Renewal Association (Entity), a New Jersey general partnership qualified as an urban renewal association under Section 3 of the Fox–Lance Law, *N.J.S.A.* 40:55C–44.1, and the City of Newark entered into a financial agreement, as defined and provided in Sections 20 through 25 of the Fox–Lance Law, *N.J.S.A.* 40:55C–59 to –64. That financial agreement concerned the construction of an urban renewal project consisting of a seventeen-story office building (Project).[2] In respect of the incentives allowed for the develop-

---

[2] We retain the nomenclature the parties adopted in their financial agreement which, in turn, was borrowed from the provisions of the Fox–Lance Law. *See N.J.S.A.* 40:55C–44.1 (defining "urban renewal association"); *N.J.S.A.* 40:55C–44.2 (defining "urban renewal entity"); *N.J.S.A.* 40:55C–46 (defining "project");

ment of the Project, Paragraph 3 of the financial agreement provided that

> [t]he Project to be constructed by the Entity shall be *exempt from taxation[ ] on improvement(s)* in accordance with the provisions of the [Fox–Lance Law] and in the manner provided by this [financial a]greement, for a period of not more than twenty (20) years from the date of execution of this [financial a]greement, or earlier at the end of fifteen (15) years of operation of said Project, and only so long as the Entity and its Project remain subject to the provisions of the [Fox–Lance Law] and complies with this [financial a]greement.
>
> [ (Emphasis supplied; internal quotation marks omitted).]

In Paragraph 4(a) of the financial agreement, the parties further agreed that, in lieu of its contractually exempted real estate tax obligations, "the Entity shall make payment to the City of an Annual Service Charge for municipal service supplied to said Project of a sum equal to 2% of the total Project cost[.]" They also covenanted that "in no event shall such payment together with the taxes on the land, in any year after the first occupancy of the Project[,] be less than the total taxes (agreed to be $70,-402.22)[ ] assessed on all the real property in the area covered by the Project[.]" In addition, they contracted that "[t]he agreed minimum annual service charge shall [in] no wise be reduced through any tax appeal on land and/or building(s), during the period that this [financial a]greement shall be in force."

The parties also contemplated and addressed the resolution of disputes between them. In Paragraph 7 of the financial agreement, they agreed that

> [i]n the event of a breach of the [financial a]greement by either of the parties hereto or a dispute arising between the parties in reference to the terms and provisions as set forth herein, either party may apply to the Superior Court of New Jersey by an appropriate proceeding, to settle and resolve said dispute in such fashion as will tend to accomplish the purposes of the [Fox–Lance Law]. In the event the Superior Court shall not entertain jurisdiction[,] then the parties shall submit the dispute to the American Arbitration Association in New York to be determined in accordance with its rules and regulations in such a fashion to accomplish the purposes of [the Fox–Lance Law].

---

*N.J.S.A.* 40:55C–59 (defining form of agreement between taxpayer and municipality as "financial agreement").

The Entity and the City also envisioned a possible sale or other transfer of the Project. Thus, in Paragraph 16 of the financial agreement, they provided that, upon the sale of the Project, "the tax abatement granted hereunder shall terminate unless the City consents in writing to the sale, but such consent shall not be unreasonably withheld[.]" They agreed, however, that "a transfer of the property to a limited partnership to be formed, retaining the same general partners as the Entity shall not be deemed a re-financing, sale or other disposition for purposes of this paragraph [16]." (internal quotation marks omitted). In other words, the Entity and the City agreed that the sale or other disposition of the Project would trigger the termination of the contracted-for tax abatement unless (1) the City consented to that transfer or (2) the transfer was in form only, from the Entity's then-existence as a general partnership to a limited partnership comprised of the same members as the Entity.

After it was developed and operating, the Project encountered financial difficulties. As a result, in 1991, the Entity filed for reorganization pursuant to Chapter 11 of the United States Bankruptcy Code, 11 *U.S.C.* §§ 1101 to 1174, a filing made in the United States Bankruptcy Court for the District of New Jersey. The plan of reorganization provided that a new lender would provide appropriate financing to make the Project viable and, as part of the financing package, the new lender required that ownership of the Project be transferred to a trust. By an order dated August 2, 1996 implementing the July 11, 1996 court-approved reorganization plan, the Bankruptcy Court provided that the Entity

*may,* at the request of the Lender, and subject to all liens and encumbrances, *cause the [Project] to be conveyed to an Owner's Trust ... organized under the laws of State of Delaware* and in which the Individual Majority Partner, the Individual Minority Partner and the Corporate Majority Partner shall have the same ownership interests as they each have in the [Entity] on the date hereof, *it being the intention of this Court that such conveyance shall cause a transfer in form of ownership from the [Entity]'s current form, a New Jersey general partnership, to the ... Owner's Trust, without the written concurrence of any other party,* including the Individual Majority Partner, the Individual Minority Partner, the Corporate Majority Partner, MBL [Life Assurance Corporation], [the

Entity's Bankruptcy] Advisory Committee, the NEDC [Newark Economic Development Corporation] 3 or any combination of the foregoing *or other persons or entities.*

[ (Emphasis supplied).]

Significantly, although the City was not a party to that order, it was present, through counsel, at both the hearing at which that order was entered, as well as the closing where the title transfer was effected. Yet, it neither interposed an objection to the transfer of the Project from the Entity to the Trust nor warned that such transfer might jeopardize the Project's tax abatement.

After the Project was transferred to the Trust, the City issued several added/omitted assessments to the Trust relating to the fourth quarter of the then-current fiscal year; these were sent to the servicing bank for the Trust and represented a quarterly increase in the Project's real estate taxes of over one-half million dollars. According to a July 1, 1997 internal memorandum from the City's tax assessor to its corporation counsel, the tax assessor took the position that the Project had been transferred to the Trust and that because no "transfer of the tax abatement has been approved by the Newark Municipal Council, therefore, [the tax assessor was] placing [the Project] on the 1997 Added/Omitted Assessment List." The tax assessor's memorandum did not address, much less analyze, how or why that transfer had occurred.

The servicing bank for the Trust forwarded the added/omitted assessment bills to plaintiff, Edward R. McMahon, the court-appointed receiver for the Entity.[4] After investigating the provenance of these real estate tax bills and receiving a copy of the City's July 1, 1997 memorandum, on December 24, 1997, plaintiff

---

[3] The Newark Economic Development Corporation held a second mortgage on the Project, which secured economic stimulus funds it advanced towards the Project.

[4] In the interim, the owners of the Entity had been involved in a dispute among themselves; the minority partner applied for relief and the Superior Court ordered that the Entity's constituent partnerships be dissolved and appointed plaintiff as receiver to control the Entity's assets and provide for its dissolution.

wrote to the executive director of the Newark Economic Development Corporation (NEDC), referenced their earlier conversations concerning these tax bills, and sought his assistance in resolving this matter. A few days later, plaintiff also forwarded to the NEDC executive director copies of selected pages of the transcript of proceedings before the Bankruptcy Court where the transfer of the Project from the Entity to the Trust was discussed. Plaintiff later acquired a copy of the closing statement where the Project was transferred from the Entity to the Trust. Both documents plainly showed the appearance of counsel for the City—the same lawyer—at each event.

By a letter dated January 6, 1998, the executive director of the NEDC wrote to the City's corporation counsel, explaining that the NEDC held a second-priority mortgage on the Project. He stated that "[t]he first mortgagee has instituted a foreclosure action against [the Trust] and named NEDC as a defendant due to it[s] position as a subordinate lien holder." He noted that "[i]n an attempt to settle the foreclosure action, the property is currently being offered for sale, pursuant to a court order" and that "[s]hould no third[-]party purchaser be identified, then an affiliate corporation of NEDC would offer to purchase the building together with Prudential,[5] the first mortgagee, who would provide the needed capital[.]" He underscored that NEDC had "just become aware of a problem with the status of the tax abatement that would make it impossible for any sale of the building to take place and thus cause the second mortgage, *which is actually City of Newark money*[,] to be at greater risk of being completely foreclosed." (Emphasis supplied). The NEDC executive director recounted that, "[a]s a part of [a] Bankruptcy Court ordered refinancing transaction, [the Entity] transferred by way of deed . . . all of its interest in [the Project] to [the Trust,]" noting that "[t]he Trust was established as part of the refinancing transac-

---

[5] The closing statement for the August 1996 refinance pursuant to the plan of reorganization authorized by the Bankruptcy Court lists the lender as "Prudential Securities Incorporated."

tion[.]" Acknowledging that "[n]o transfer of the tax abatement agreement to the Trust was effectuated, nor was the Trust an 'Urban Renewal Entity[,]' " he recounted that "the abatement ... was cancelled ... due to the failure to transfer the abatement to the Trust with Municipal Approval."

Shifting the focus of his plea, the executive director of the NEDC explained to the City's corporation counsel that "[t]he loss of the tax abated status for approximately one and ½ years would result in an additional tax liability of approximately $500,000.00 for the property." He concluded that "[t]his additional liability would eliminate any possibility of a sale of the building[,]" thus placing at risk NEDC's—and Newark's—funds secured by the subordinated, second mortgage. He thus "request[ed] that the tax abatement be restored retroactively to the time of its cancellation." He proposed achieving that result by "a deed transferring the property to the urban renewal entity to be executed and recorded, thereby returning ownership to the approved urban renewal entity." In his view, "[t]he transfer to the Trust, while technically deficient, was not a substantial 'default.' " He urged that the "S.I.L.O.T. [service charge-in-lieu-of-taxes] payments have been and remain current[,]" and opined that "[i]n light of the Court[-]ordered refinancing and the identity of interest of the partners of [the Entity] and the Trust, a court action to restore the abatement would probably be successful." He predicted that "[a]ny uncertainty regarding the status of the abatement or delay in restoring same[ ] will[,] however, probably result in the withdrawal of the building from the market place resulting in the renewal of the foreclosure."

Those efforts, along with the separate endeavors engaged in by plaintiff in seeking to resolve this impasse, were in vain.[6] As a

---

[6] In the interim, in August 1998, the Project was again refinanced and the Prudential first mortgage and the NEDC second mortgage were satisfied from those refinancing proceeds. Also in the interim, plaintiff made a $600,000 payment to the City for current tax obligations, which payment—contrary to the

result, on December 9, 1998, plaintiff filed a verified complaint in the Superior Court seeking (1) a declaratory judgment that "the purported cancellation of the tax abatement was wrongful and therefore null and void;" (2) an order requiring that the City, its finance department and its tax assessor "reinstate the tax abatement retroactively ... and to rescind all tax bills issued subsequent to its purported cancellation of the tax abatement;" (3) an order requiring that the City issue restated tax bills and properly account for all payments made; (4) "[i]nterest, attorneys' fees and costs of suit; and" (5) such other relief "as the Court may deem just and proper."

The City filed its answer and affirmative defenses; it later moved to dismiss that complaint. In response to that motion, and by an order dated January 18, 1999, the cause was transferred to the Tax Court. In order "to toll the assessment of any interest or penalties, if any," on February 1, 1999, the parties entered into a stipulation reconciling the payments made against the amounts claimed to be due and providing for the payment of an agreed-upon sum so that "all taxes on the [Project] will be totally current[.]" A desultory motion practice followed but, as a practical matter, the case lay dormant until July 2005, when the case was reassigned to a different Tax Court judge and a case management order was entered. That order required that the parties file and respond to summary judgment motions by certain defined dates.

In compliance with the case management order, the City timely moved for summary judgment. It claimed that the cause was properly before the Tax Court, and that the statute of limitations barred plaintiff's complaint. Plaintiff opposed that application, alleging that because, at its core, this action is one for breach of contract and not a tax appeal, it is not cognizable in the Tax

clear and specific instructions in its transmittal—was applied by the City against the claimed arrears.

Court.[7]  In a written opinion dated October 21, 2005, the Tax Court granted the City's motion.

Explaining that "plaintiff characterizes its complaint as 'challenging those taxes' and not an 'appeal of the assessment based upon property value' which results in the 'taxes payable[,]' " the Tax Court concluded that plaintiff nevertheless was required to file an appeal from the challenged added/omitted assessments in the manner prescribed by *N.J.S.A.* 54:4–63.11.  In relevant part, that statute provides that "[a]ppeals from added assessments may be made to the county board of taxation on or before December 1 of the year of levy, or 30 days from the date the collector of the taxing district completes the bulk mailing of tax bills for added assessments, whichever is later[.]" *Ibid.*  It further provides that, in addition and for cases in which "the aggregate assessed valuation of the property exceeds $750,000.00[,]" appeals from added assessments "may be made directly to the Tax Court on or before December 1 of the year of levy, or 30 days from the date the collector of the taxing district completes the bulk mailing of tax bills for added assessments, whichever is later[.]" *Ibid.*  It also mandates that "[a]ppeals to the Tax Court from the judgment of the county board of taxation shall be made within 45 days from the date fixed for final decisions by the county board of taxation on appeals from added assessments." *Ibid.*  Finally, it instructs that "[i]n all other respects such appeals shall be governed by the laws concerning appeals from real property assessments." *Ibid.*[8]

Relying on *Macleod v. City of Hoboken,* 330 *N.J.Super.* 502, 506–07, 750 *A.*2d 152 (App.Div.2000), the Tax Court reasoned that "not even constitutional implications could mask the truth that a

---

[7] As summarized by the Tax Court, plaintiff also alleged that the case was "not ripe for summary judgment;" that the City "is estopped from bringing the within motion based upon its previous conduct;" and that "there exists or may exist a 'binding and dispositive' settlement."

[8] *N.J.S.A.* 54:4–63.39 governs appeals from omitted assessments in a substantially similar manner.

tax appeal was required as the required statutory remedy[.]" Quoting *Macleod*, it concluded that the legislatively designed tax appeal scheme as a whole " 'required [the plaintiff] to comply with all applicable statutory requirements[,]' " and that " '[t]he statutory scheme contemplates a prescribed chain of review [for appeal] of a tax assessor's actions[.]' " *Id.* at 505–06, 750 *A*.2d 152. It observed that "[t]he parties, simply stated, cannot divest by agreement either the County Tax Board or the Tax Court of its statutory role in reviewing the actions of an assessor that impact upon the tax liability of a taxpayer." It stated further that

> [e]ven where the claim is that there has been no change of ownership and the added/omitted assessment was void ... and even though the claim may be correct, the remedy is not to seek declaratory relief but to appeal in accordance with statutory procedures and requirements, including *N.J.S.A.* 54:4–63.11. Recourse to the established tax appeal statutory scheme gives a readily available and adequate remedy.
>
> [ (Citations and footnote omitted).]

In the Tax Court's view, "we do not reach the final step beyond the ending of the tax abatement agreement, right or wrong, i.e.[,] 'the taxes ... imposed wrongly,' without the operative step of the added/omitted assessment process." It concluded that, "[s]imply stated another way, the termination of the agreement alone does not change the tax consequences." [9]

Plaintiff appealed and, in an unpublished opinion, the Appellate Division affirmed. It explained that "[t]he time for appealing

---

[9] The Tax Court also rejected plaintiff's remaining arguments. In response to plaintiff's claim that the case was not ripe for summary judgment, the Tax Court found that "plaintiff confuses the need for discovery as to the merits of its claim for relief with the need for further discovery as to the threshold issue of law presently before the court in the defendant's motion." Rejecting plaintiff's estoppel claim, the Tax Court held that "the only party to whom estoppel should be applied would be the plaintiff [because t]here is simply nothing presented that prevented any timely action being taken in the face of an objection to an assessment requiring the payment of what the plaintiff terms taxes ... imposed wrongly.' " Finally, it rejected plaintiff's claim that the case had been settled, stating that "if this litigation of seven years has at some point been settled[,] all that would have to be done is for the plaintiff to produce a resolution of the governing body approving a settlement, a matter of public record readily attainable, never mind a fully executed stipulation. This has not been done."

added and omitted assessments is December 1 of the year of the levy." It further noted that

> [t]he right of appeal in tax matters is governed by statute and all statutory requirements must be strictly complied with to invest the reviewing tribunal with subject matter jurisdiction. The failure to file a timely appeal is a fatal jurisdictional defect. The policy behind strict time limitations in tax appeals manifests the Legislature's objective to set out a well-organized time table which will allow municipalities to determine the value of their tax ratables and enable them to adopt a responsible and reasonably accurate budget.
> [ (Citations and internal quotation marks omitted).]

Concluding that the proper procedural avenue plaintiff should have pursued was a tax appeal, it found that "the City complied with the requirements of the local property tax law by forwarding in October 1997 its tax bills to the Trust, which was the owner of record of the property[,]" and that "[t]he bills made clear that any appeal challenging the assessments had to be filed before December 1." It observed that the "Trust forwarded the bills to plaintiff on or about October 23, 1997, which afforded plaintiff ample time to investigate the relevant facts and file appeals challenging the assessments before the statutory deadline[,]" and that "the complaint in this matter was not filed until December 9, 1998, more than a year past the deadline for contesting the 1997 assessments." The panel held that "because plaintiff was challenging the tax assessments, and [was] seeking to have the assessments set aside, his complaint is subject to the statutory time deadlines imposed by *N.J.S.A.* 54:4–63.11 and *N.J.S.A.* 54:4–63.39[,]" reasoning that "[t]hose deadlines cannot be avoided by the pleading of an alternative cause of action or an alternative legal theory." It therefore rejected plaintiff's attack on the added/omitted assessments at issue.[10]

We granted plaintiff's petition for certification, which sought review on four separate grounds. 192 *N.J.* 479, 932 *A.*2d 29 (2007). However, because we conclude that plaintiff was entitled to have his case heard in the Superior Court in the first instance,

---

[10] The Appellate Division also rejected plaintiff's remaining arguments, which paralleled those plaintiff advanced before the Tax Court.

the Tax Court lacked jurisdiction to determine this controversy. Therefore, we vacate the judgment of the Appellate Division and remand the cause to the Superior Court for consideration of plaintiff's complaint *ab initio.*

## II.

According to plaintiff, "the Appellate Division failed to recognize the significance of Paragraph 7 of the Parties' [financial a]greement[.]" In plaintiff's view, the financial agreement "permitted the parties to invoke the jurisdiction of the Superior Court in the event of a breach of the [financial a]greement or a dispute between the parties regarding the terms and provisions of the [financial a]greement." Plaintiff urges that "the City's purported retroactive cancellation of [the Entity]'s tax abatement breached its obligations under the [financial a]greement." As plaintiff sees it, in this case "[t]he issue of the amount of the assessment is not in dispute, but rather, whether such an assessment could be made at all under the terms of the parties' [financial] agreement." He concludes that "resolution of the dispute as to the legal effect of the technical transfer in title and the City's breach of [the financial a]greement were properly referable to the Superior Court, not the Tax Court."

The City argues for the unbridled supremacy of the tax appeal process. It claims that "to allow other causes of action with other statutory deadlines would impermissibly undermine the administration of the property tax system and the related operation of the municipal budget." It notes that "[i]t is important to realize that this rule does not preclude the use of another forum for disputes between parties that do not deal with a challenge to an assessor's actions in establishing an assessment." According to the City, "[i]t simply means that parties to a public agreement between themselves cannot ignore or avoid mandatory statutory procedures." Thus, in the City's view, all agreements between a municipality and a taxpayer are subordinate to the tax appeal

process, regardless of the terms to which the City explicitly may have agreed.

## III.

### A.

Taxation of real property in New Jersey is of constitutional dimension. In addition to requiring that "[p]roperty shall be assessed for taxation under general laws and by uniform rules[,]" *N.J. Const.* art. VIII, § 1, ¶ 1(a), New Jersey's Constitution requires that "[a]ll real property assessed and taxed ... shall be assessed according to the same standard of value, [and] shall be taxed at the general tax rate of the taxing district in which the property is situated, for the use of such taxing district." *Ibid.*

A comprehensive statutory scheme seeks to implement that constitutional mandate. Thus, the Legislature has required that all real property taxes in New Jersey be assessed annually at the local or municipal level. *See N.J.S.A.* 40A:9–146 (requiring that municipal governing body or chief executive "shall provide for the appointment of a tax assessor and such deputy tax assessors as it may determine necessary"); *N.J.S.A.* 54:4–23 (providing that "[a]ll real property shall be assessed to the person owning the same on October 1 in each year"). In exercising those functions, the assessor—although a municipal employee—remains free of any local control. *Clinton Twp. Citizen's Comm., Inc. v. Mayor and Council of Twp. of Clinton,* 185 *N.J.Super.* 343, 353, 448 *A.*2d 526 (Law Div.1982) (explaining that "[i]n performing his assessment duties the municipal tax assessor acts under the supervision and control of his county board of taxation and the Director of the Division of Taxation. *N.J.S.A.* 54:3–16; *N.J.S.A.* 54:1–27 and 54:1–35.51."). In this respect, it rightly has been observed that "the Legislature has insured a certain degree of independence and job security for assessors because of the need to insulate them from local political pressures[, and t]he courts have attempted to protect this independence." *Mobil Oil Corp. v. Greenwich Twp.,*

20 *N.J. Tax* 66, 82 (Tax Ct.2002) (citations omitted). Once a tax assessor completes the assessments for the municipality, the assessment roll is submitted to the county board of taxation, *N.J.S.A.* 54:4–35, and, based in part on the assessments provided by all assessors in that county, the county board sets the tax rate for the municipality. *N.J.S.A.* 54:4–48 and –49.

A slightly different process applies either when improvements are added to real property or when improvements previously omitted are included in an existing assessment. *Compare N.J.S.A.* 54:4–63.1 to –63.11a (added assessments), *with N.J.S.A.* 54:4–63.12 to –63.30 (omitted assessments made by the county board of taxation—original method) *and N.J.S.A.* 54:4–63.31 to –40 (omitted assessments made by tax assessor—alternate method). Appeals from added assessments are taken either to the county board of taxation and then to the Tax Court or, in certain limited instances, directly to the Tax Court. *N.J.S.A.* 54:4–63.11. Appeals from original method omitted assessments issued by the county board of taxation lie directly to the Tax Court, *N.J.S.A.* 54:4–63.23, while appeals from alternate method omitted assessments issued by the tax assessor are cognizable in the same manner as appeals from added assessments: either to the county board of taxation and then to the Tax Court or, in certain limited instances, directly to the Tax Court. *N.J.S.A.* 54:4–63.39.

Judicial review of tax assessments, added assessments and omitted assessments is also part of the comprehensive statutory framework. To implement that review, the Tax Court was "established as a court of limited jurisdiction pursuant to Article VI, Section 1, paragraph 1 of the New Jersey Constitution[,]" *N.J.S.A.* 2B:13–1(a), and is "a court of record[,]" *N.J.S.A.* 2B:13–1(b). Its jurisdiction is defined by statute:

a. The Tax Court shall have jurisdiction to review actions or regulations with respect to a tax matter of the following:

(1) Any State agency or official;

(2) A county board of taxation;

(3) A county or municipal official.

b. The Tax Court shall have jurisdiction over actions cognizable in the Superior Court which raise issues as to which expertise in matters involving taxation is desirable, and which have been transferred to the Tax Court pursuant to the Rules of the Supreme Court.

c. The Tax Court shall have jurisdiction over any other matters as may be provided by statute.

d. The Tax Court jurisdiction shall include any powers that may be necessary to effectuate its decisions, judgments and orders.

[*N.J.S.A.* 2B:13–2.]

It is empowered to "grant legal and equitable relief so that all matters in controversy between the parties may be completely determined[,]" *N.J.S.A.* 2B:13–3(a), and its "[j]udgments ... may be appealed as of right to the Appellate Division of the Superior Court[,]" *N.J.S.A.* 2B:13–4.

In sum, " '[t]he right to appeal a real property assessment is statutory, and the appellant is required to comply with all applicable statutory requirements.' " *Macleod, supra,* 330 *N.J.Super.* at 505, 750 *A.*2d 152 (quoting *F.M.C. Stores Co. v. Borough of Morris Plains,* 195 *N.J.Super.* 373, 381, 479 *A.*2d 435 (App.Div. 1984), *aff'd,* 100 *N.J.* 418, 495 *A.*2d 1313 (1985)). Moreover, "[t]he statutory scheme contemplates a prescribed chain of review for appeal of a tax assessor's actions through the county tax board and the court system, starting with the Tax Court." *Id.* at 506, 750 *A.*2d 152. A review of this legislatively mandated structure leads to the well-founded conclusion that "[o]ur State's statutory scheme provides full administrative review of the property tax assessment of any aggrieved taxpayer." *Id.* at 508, 750 *A.*2d 152. It is against this comprehensive mosaic of procedural safeguards—one with which continuing strict and unerring compliance must be observed—that we gauge plaintiff's contest of the City's added/omitted assessments arising from the City's rejection of the contractually agreed upon tax abatement for the Project.

### B.

No doubt, if plaintiff's complaint had addressed the quantum or methodology applied in respect of the added/omitted assessments issued by the City's tax assessor, his complaint would

have fallen squarely within the band of cases subject to the established tax appeal process. In that instance, because plaintiff did not file a timely tax appeal, plaintiff's complaint would have been time-barred and the Tax Court would have lacked jurisdiction to hear the cause. *See N.J.S.A.* 54:4–63.11 (time for appeals from added assessments); *N.J.S.A.* 54:4–63.23 (time for appeals from omitted assessments—original method); *N.J.S.A.* 54:4–63.39 (time for appeals from omitted assessments—alternate method). This is so because "both appealing taxpayers and taxing districts must adhere strictly to the deadlines prescribed by statute. Failure to file a timely appeal is a fatal jurisdictional defect." *F.M.C. Stores Co., supra,* 100 *N.J.* at 425, 495 *A.*2d 1313. *Accord Appeal of Twp. of Monroe from Determination of Local Fin. Bd.,* 289 *N.J.Super.* 138, 146, 673 *A.*2d 279 (App.Div.1995) (explaining that "[f]ailure to meet [the statutorily imposed] filing deadlines is a fatal jurisdictional defect" (citation omitted)); *Mase Land Co. v. Jefferson Twp.,* 20 *N.J. Tax* 439, 443 (Tax Ct.2002) (quoting *F.M.C. Stores Co., supra,* 100 *N.J.* at 425, 495 *A.*2d 1313).

■ Plaintiff's complaint, however, did not challenge the amounts of the added/omitted assessments issued by the City's tax assessor or the manner in which those amounts were determined. Instead, plaintiff's challenge directly addressed the City's unilateral determination that, by transferring the Project from the Entity to the Trust, the financial agreement between the Entity and the City had been breached, thereby—plaintiff claims—wrongfully triggering the forfeiture of the contractually agreed upon tax abatement. Thus, plaintiff reasons, the pure contractual nature of this claim requires that the contractually agreed forum for the resolution of this dispute—either the Superior Court or arbitration, but not the tax appeal process—be invoked.

We agree. At its core, this is a contract and estoppel case, nothing more. The nature of plaintiff's challenge does not speak to the issues uniquely cognizable within the tax appeal process, but to the more fundamental question of whether the tax assessor had the authority to determine unilaterally that the bargained-for

tax abatement was no longer operative. Stated differently, plaintiff claims that the City breached the financial agreement when the tax assessor concluded that, because the Project had been transferred to the Trust and no "transfer of the tax abatement has been approved by the Newark Municipal Council," the financial agreement no longer was operative and the Project could be separately taxed and the Project placed "on the 1997 Added/Omitted Assessment List." According to the parties' financial agreement, the forum for the resolution of that breach of contract dispute was not by means of a tax appeal; Paragraph 7 of the financial agreement plainly sets forth that such dispute is cognizable in the Superior Court or, failing Superior Court jurisdiction, arbitration under the rules of the American Arbitration Association.

It has long been the rule in New Jersey that "court[s] cannot relieve municipalities from hard bargains[.]" *City of Newark v. N. Jersey Dist. Water Supply Comm'n,* 106 *N.J.Super.* 88, 103, 254 *A.*2d 313 (Ch.Div.1968), *aff'd o.b.,* 54 *N.J.* 258, 255 *A.*2d 193 (1969). It has been emphasized that "[m]unicipal contracts stand on the same footing as contracts between natural persons and courts will not inquire into the reasonableness of the terms of such contracts in the absence of bad faith, fraud or capricious action." *Ibid.* (citation omitted). *See also Port Auth. v. Affiliated FM Ins. Co.,* 2000 *WL* 35572338, \*23, 2000 *U.S. Dist. LEXIS* 20724, \*77 (D.N.J. June 5, 2000) ("In the contractual setting, States can bind themselves just like private parties."); *Dworman v. Mayor and Bd. of Aldermen, the Governing Body of the Town of Morristown,* 370 *F.Supp.* 1056, 1071 (D.N.J.1974) (quoting *City of Newark, supra,* 106 *N.J.Super.* at 103, 254 *A.*2d 313).

Also, this Court repeatedly has hewed to the maxim that "[c]ourts cannot make contracts for parties. They can only enforce the contracts which the parties themselves have made." *Kampf v. Franklin Life Ins. Co.,* 33 *N.J.* 36, 43, 161 *A.*2d 717 (1960) (citation and internal quotation marks omitted). In other words, "[w]hen the terms of [a] contract are clear, it is the

function of a court to enforce it as written and not to make a better contract for either of the parties [because t]he parties are entitled to make their own contracts." *Ibid.* (citations omitted). *See also State v. Signo Trading Int'l, Inc.*, 130 *N.J.* 51, 63, 612 *A.2d* 932 (1992) (quoting *Kampf, supra*). Thus, "[a]s a general rule, courts should enforce contracts as the parties intended." *Pacifico v. Pacifico*, 190 *N.J.* 258, 266, 920 *A.2d* 73 (2007). In doing so, the judicial task is clear: the "court must discern and implement the common intention of the parties [and its] role is to consider what is written in the context of the circumstances at the time of drafting and to apply a rational meaning in keeping with the expressed general purpose." *Ibid.* (citations and internal quotation marks omitted).

The application of these principles requires that we reject the reasoning of both the Tax Court and the Appellate Division, and conclude, rather, that the controversy presented by plaintiff is not cognizable within the context of a tax appeal, but constitutes instead, in the plain words of the financial agreement, "a breach of the [financial a]greement by either of the parties hereto or a dispute arising between the parties in reference to the terms and provisions as set forth [t]herein[.]" In that instance, the parties bargained for and settled on a forum to resolve that breach or dispute: either the Superior Court or, failing that, arbitration. We envision no reason these obviously sophisticated parties should not be bound by the covenants into which they freely and voluntarily entered. We will enforce that bargain.

▬▬▬ That said, we must define the scope of relief to be afforded. We conclude that the judgment of the Appellate Division must be vacated. The Tax Court is vested with limited jurisdiction, *N.J.S.A.* 2B:13–2; *see also Union City Assocs. v. Union City*, 115 *N.J.* 17, 23, 556 *A.2d* 769 (1989) (explaining that Tax Court is "[a] court of limited jurisdiction" (citation and internal quotation marks omitted)), and, under the parties' agreement, its jurisdiction did not extend to this subject matter. *See, e.g., Nagy v. Ford Motor Co.*, 6 *N.J.* 341, 349, 78 *A.2d* 709 (1951)

(noting that where adjudicative body of limited jurisdiction "transcends its jurisdiction, the action is a nullity" (citation omitted)); *Maguire v. Van Meter*, 121 *N.J.L.* 150, 152, 1 *A.*2d 445 (E. & A.1938) (stating that "lack of jurisdiction will subject the judgment of any court to collateral attack for such judgment is wholly nugatory and may be disregarded. . . . In legal contemplation it is wholly inoperative because it was not within the power of the [adjudicative body] to enter such judgment."). The fundamental proposition is both of long standing and easily stated: "the judgment of a tribunal lacking jurisdiction to enter such judgment is utterly void." *Id.* at 153, 1 *A.*2d 445.

Furthermore, even assuming the Tax Court had the subject matter authority to determine this controversy, plaintiff's complaint—originally and properly—was filed in the Law Division, and "where two courts in the same state have concurrent jurisdiction over a matter, the court in which jurisdiction is first invoked obtains *exclusive* jurisdiction." *Union City Assocs., supra*, 115 *N.J.* at 26, 556 *A.*2d 769 (emphasis supplied).

We therefore vacate the judgment of the Appellate Division and remand the cause to the Law Division, where this action first began. *See R.* 1:13–4(b). In that forum, plaintiff and the City may litigate anew all matters concerning whether the issuance of the added/omitted assessments for the Project constituted a breach of the parties' financial agreement. If those acts constituted an actionable breach, then the tax assessor's actions were a nullity and plaintiff is entitled to reinstatement of its tax abatement under the terms of and pursuant to the financial agreement. If not, however, plaintiff—having elected to forego a tax appeal and now being time-barred from prosecuting one—will be bound by the assessments as issued.

## IV.

The judgment of the Appellate Division is vacated and the cause is remanded to the Law Division for further proceedings in accordance with the principles to which we have adverted.

*For vacation and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE and RIVERA–SOTO—6.